## BOARD OF COUNTY COMMISSIONERS ET AL. *v.* SEBER ET AL.

No. 556. Argued March 3, 4, 1943.—Decided April 19, 1943.

*Messrs. Mac Q. Williamson,* Attorney General of Oklahoma, and *Houston E. Hill,* Assistant Attorney General, with whom *Mr. Norman J. Futor,* Assistant Attorney General, was on the brief, for petitioners.

*Mr. George H. Jennings,* with whom *Mr. Leonard O. Lytle* was on the brief, for respondents.

By special leave of Court, *Mr. Warner W. Gardner,* with whom *Solicitor General Fahy, Assistant Attorney General Littell,* and *Messrs. Norman MacDonald* and *Archibald Cox* were on the brief, for the United States, as *amicus curiae,* urging affirmance.

MR. JUSTICE MURPHY delivered the opinion of the Court.

This petition for certiorari presents the questions whether certain lands held by respondent Indians, subject to restrictions against alienation and encumbrance without the approval of the Secretary of the Interior, were exempt from Oklahoma real estate taxes for the year 1937 by virtue of the Act of June 20, 1936, 49 Stat. 1542; [1] whether a portion of those lands were exempt for subsequent years by virtue of the Act of 1936 as amended by the Act of May 19, 1937, 50 Stat. 188; [2] and whether the Acts of 1936 and 1937, so applied, are constitutional.

The facts are agreed. Prior to 1931, the Secretary of the Interior purchased three tracts of land, two rural and one urban, in Creek County, Oklahoma, for Wosey John Deere, an enrolled, full-blood member of the Creek Tribe of Indians. The purchase price was paid out of restricted royalties from an oil and gas lease of her restricted allot-

---

[1] Section 2 of this Act provides:

"All lands the title to which is now held by an Indian subject to restrictions against alienation or encumbrance except with the consent or approval of the Secretary of the Interior, heretofore purchased out of trust or restricted funds of said Indian, are hereby declared to be instrumentalities of the Federal Government and shall be nontaxable until otherwise directed by Congress."

[2] The 1937 Act amended § 2 of the 1936 Act to read as follows:

"All homesteads, heretofore purchased out of the trust or restricted funds of individual Indians, are hereby declared to be instrumentalities of the Federal Government and shall be nontaxable until otherwise directed by Congress: *Provided,* That the title to such homesteads shall be held subject to restrictions against alienation or encumbrance except with the approval of the Secretary of the Interior: *And provided further,* That the Indian owner or owners shall select, with the approval of the Secretary of the Interior, either the agricultural and grazing lands, not exceeding a total of one hundred and sixty acres, or the village, town or city property, not exceeding in cost $5,000, to be designated as a homestead."

ted land. She was given title subject to a condition against alienation or encumbrance without approval of the Secretary prior to April 26, 1931.[3] Before that date, with the approval of the Secretary, she reserved a life estate and conveyed the fee to her children, full-blood but un-enrolled Creeks and respondents here, subject to a like condition against alienation or encumbrance without the approval of the Secretary with the exception that the restriction had no definite time limitation. On December 10, 1937, Wosey John Deere conveyed her life estate to respondents so that they became full owners subject to a restriction against alienation or encumbrance without the approval of the Secretary. Both conveyances were in consideration of love and affection. Thereafter, on December 16, 1937, respondents designated the two rural tracts, totalling eighty-seven and one-half acres, as a tax exempt homestead under the provisions of the Act of May 19, 1937, and the Secretary approved this designation on March 24, 1938.

Before the Act of June 20, 1936, the lands were subject to Oklahoma real estate taxes.[4] Thereafter all three tracts were continued on the tax rolls of Creek County, and respondents, to avoid the accumulation of penalties and interest and a sale of the lands for taxes, paid the

---

[3] In *Sunderland* v. *United States*, 266 U. S. 226, it was held that the Secretary of the Interior had power to impose such a restriction against alienation or encumbrance with respect to lands purchased for Indians of the Five Civilized Tribes (of which the Creeks are one) with the proceeds from sales of their restricted allotted lands. We think it clear that he also has authority to impose such restrictions upon lands purchased with restricted funds from leases of restricted allotted lands (see *Shaw* v. *Gibson-Zahniser Oil Corp.*, 276 U. S. 575, and *United States* v. *Brown*, 8 F. 2d 564 at 568), and to make those restrictions run with the lands in the hands of Indian grantees. Cf. *Drummond* v. *United States*, 34 F. 2d 755, 758–59; *United States* v. *Goldfeder*, 112 F. 2d 615.

[4] See *Shaw* v. *Gibson-Zahniser Oil Corp.*, 276 U. S. 575.

taxes for the years 1936, 1937, 1938, and part of 1939. On July 26, 1940, they filed this action in federal district court for the recovery of the 1936 and 1937 taxes paid on all three tracts, for the recovery of the 1938 and 1939 taxes paid on the two rural tracts designated as homestead lands, and for a declaration that the homestead lands were tax exempt. The district court gave judgment as prayed. 38 F. Supp. 731. The Circuit Court of Appeals affirmed for the most part but reversed with respect to the 1936 taxes on the ground that liability for them became fixed on the assessment date, January 1, 1936, before the enactment of the Act of June 20, 1936. Interest on the taxes paid was also disallowed. 130 F. 2d 663. The importance of the case in the administration of Indian affairs and its impact upon state finances caused us to grant the County's petition for certiorari. Respondents have not cross-petitioned for review of the adverse decision on the 1936 taxes and the allowance of interest, so it is unnecessary to consider those questions.

We hold that the 1936 Act extended tax immunity to all three tracts for the year 1937, that thereafter the 1937 Act exempted the designated homestead lands, and that both Acts, so applied, are constitutional.

Section 2 of the 1936 Act conditions tax immunity upon two requirements: (1) "title" to the lands must be "held by an Indian subject to restrictions against alienation or encumbrance except with the consent or approval of the Secretary of the Interior"; and, (2) the lands must have been "heretofore purchased out of trust or restricted funds of said Indian." Both requirements are met here with respect to all three tracts. These lands were purchased from the restricted royalties received from an oil and gas lease of the restricted allotted lands of Wosey John Deere, and, on the assessment day, January 1, 1937,[5] she held

---

[5] Under Oklahoma law, the taxable status of property in Oklahoma is fixed as of the assessment date, January 1, in each year, although

title to a freehold life estate in all the parcels, subject to restrictions against alienation and encumbrance which were validly imposed by the Secretary of the Interior.[6]

Petitioners advance two arguments against the applicability of the 1936 Act. First, they contend, from remarks made by the sponsor of the 1936 Act in the Senate,[7] that the Act applied only to lands purchased for landless Indians, and thus did not extend to lands purchased from the restricted funds of Wosey John Deere, who held allotted land. We do not read those remarks as limiting the scope of the 1936 Act to landless Indians; they do not deal in terms of exclusiveness. But if they are to be interpreted as petitioners contend, we do not accept them as definitive, because they are opposed to the clear words of the Act, the reasons for its enactment,[8] its contemporary

---

taxes are levied as of July 1. See *Board of Commissioners* v. *Central Baptist Church,* 136 Okla. 99, 276 P. 726; *In re Sinclair Prairie Oil Co.,* 175 Okla. 289, 53 P. 2d 221; *In re Champlin Refining Co.,* 186 Okla. 625, 99 P. 2d 880. For the purposes of this case, we assume without deciding that the status of the property on the assessment date is determinative.

[6] See Note 3, *ante.*

[7] Senator Thomas said in part: "Formerly the Congress authorized the Secretary of the Interior to buy land for landless Indians. The Secretary proceeded to buy the lands and assigned the Indians to reside upon such lands. The recommendation or assertion was made to the Indians that the land would be theirs and they would have no taxes to pay. . . . In some cases tax warrants have been issued and the Indians have been threatened with dispossession. The Department believes that, in order to keep faith with the Indians, the tax warrants and tax assessments should be paid and the title to the lands cleared. The bill authorizes the appropriation of money for that purpose.

"Section 2 provides that the lands so secured shall hereafter be nontaxable." 80 Cong. Rec. 9159.

[8] The Meriam Report to the Secretary of the Interior on the Problem of Indian Administration (Brookings Institute, 1928), pp. 795–98, pointed out that allotments were often unsuitable for homes, that other lands had to be purchased, and that while restricted allotted lands and the trust proceeds thereof had been held immune from state taxation,

administrative interpretation,[9] and its subsequent Congressional history.[10]   Secondly, petitioners assert that the exemption of the 1936 Act was personal and extended only to lands the title to which was held by the Indian whose restricted funds were used to purchase the lands.   This position finds some support in the language of the Act, referring to "lands the title to which is held by an Indian . . ., purchased out of trust or restricted funds of said Indian," but it is unnecessary to determine whether the purpose of Congress was such that the Act should be more broadly construed than its technical terms might indicate. For, even assuming *arguendo* that petitioners are correct in saying that the 1936 Act afforded only a personal exemption, Wosey John Deere, whose restricted funds purchased the three tracts, held a restricted life estate in each tract on January 1, 1937, the assessment date.   As the life

---

the tax status of property purchased with trust funds from sale or lease of allotted lands was in doubt.   Legislation conferring tax exemption was recommended to protect the Indians against inability to pay or their insufficient sense of public responsibility, and to keep faith since officials of the federal government had expressly or impliedly represented that lands so purchased were tax exempt.   The House and Senate reports show that this was the problem at which the 1936 Act was aimed.   H. Rep. 2398, S. Rep. 2168, 74th Cong., 2d Sess.   See also Cohen, Handbook of Federal Indian Law (1942), pp. 260–61.

[9] The Acting Attorney General and the Solicitor of the Department of the Interior both ruled that the 1936 Act applied to lands purchased from the restricted funds of individual Osage Indians who were not landless.   38 Op. A. G. 577; 56 I. D. 48.

[10] In reporting a bill to repeal the broad provision of § 2 of the 1936 Act, the House Committee on Indian Affairs said: "It will be observed from the language of section 2, . . . that it applies to *all* lands purchased by restricted Indian funds, and the Attorney General so held." H. Rep. 562, 75th Cong., 1st Sess. (emphasis supplied).   The Senate substituted for the repealer an amendment limiting § 2 to homestead lands, which became the 1937 Act, but the Senate committee report also makes it clear that the 1936 Act covered all restricted Indian lands purchased out of restricted funds.   S. Rep. 332, 75th Cong., 1st Sess.

tenant, she was obligated to pay the taxes under Oklahoma law. 60 Okla Stat. Ann. § 69; *Helm* v. *Belvin,* 107 Okla. 214, 232 P. 382; *Riley* v. *Collier,* 111 Okla. 130, 238 P. 491; *Waldon* v. *Baker,* 184 Okla. 492, 495, 88 P. 2d 352. Since the 1936 Act was concerned with a tax exemption, the proper test of whether an Indian purchaser had "title," within the meaning of the Act, must be whether he had retained such a property interest that, but for the Act, he would be subjected to the tax. Here Wosey John Deere retained such a title, and the three tracts were clearly within the 1936 Act, even accepting petitioners' construction.

Likewise, the two rural parcels comply with the description contained in the 1937 Act, which provides in part: "All homesteads, heretofore purchased out of the trust or restricted funds of individual Indians, . . . shall be nontaxable until otherwise directed by Congress: *Provided,* That the title to such homesteads shall be held subject to restrictions . . ." Those parcels were purchased from the restricted funds of an individual Indian, Wosey John Deere; respondents hold them subject to valid restrictions;[11] and they were properly designated by respondents as homestead lands on December 16, 1937, prior to the 1938 assessment date.[12] In view of the legislative history of the 1937 Act, summarized in Note 10, *supra,* petitioners' argument that the 1937 Act applies only to lands purchased for landless Indians must be rejected.

It has been suggested that the tax exemption granted by the 1937 Act is personal to the Indian whose restricted funds were used to purchase the land, or else that it extends to the land in the hands of restricted Creek Indian grantees only until 1956, consonantly with the statutes

---

[11] See Note 3, *ante.*

[12] The Secretary did not approve the designation until March 24, 1938, but we think this approval related back to the date of designation.

governing the tax status of restricted allotted lands of the Creeks.[13] The Act does not say, however, and there is not a word to suggest that upon transfer of the lands to Indian heirs or grantees, subject to restrictions, the exemption is either to terminate or else extend only until 1956. If Congress had intended either result, it could easily have expressed those purposes. It did neither, but provided instead that the lands while restricted were to remain nontaxable until it directed otherwise. In the absence of explicit Congressional direction, we do not think we should hold the exemption personal or attempt to derive an applicable principle from the complicated and admittedly ambiguous statutes governing the tax status of restricted allotted Creek lands. Respondents received the land, which they have designated as a homestead, subject to restrictions of indefinite duration which the Secretary of the Interior had authority to impose.[14] It seems only fair, as the clear words of the 1937 Act provide, that the tax exemption should follow the restrictions and continue so long as they do, unless Congress meanwhile provides to the contrary. Even if the 1937 Act were ambiguous, we think this interpretation should be taken. Cf. *United States* v. *Reily*, 290 U. S. 33, 39.

It is argued, however, that the 1936 Act created only a personal exemption, and the 1937 Act gave no more because it was an amendment to the 1936 Act intended solely to limit the unnecessarily broad exemption of that Act. It is true that this was the avowed purpose of the 1937 Act,[15] but it does not follow that the 1937 Act grants

[13] See Act of June 30, 1902, 32 Stat. 500, 503; Act of April 26, 1906, § 19, 34 Stat. 137, 144; Act of May 27, 1908, §§ 4, 9, 35 Stat. 312, 313, 315; Act of April 12, 1926, 44 Stat. 239; Act of May 10, 1928, 45 Stat. 495; Act of May 24, 1928, 45 Stat. 733; Act of March 2, 1931, 46 Stat. 1471; Act of June 30, 1932, 47 Stat. 474; Act of January 27, 1933, 47 Stat. 777.

[14] See Note 3, *ante*.

[15] See H. Rep. 562, S. Rep. 332, 75th Cong., 1st Sess.

but a personal exemption or else allows the exemption only until 1956. While the question need not be decided, it is appropriate to notice that the purpose of the 1936 Act makes it at least doubtful whether that Act afforded only a personal exemption. Assuming, however, that it did, there is nothing to indicate that the 1937 Act, contrary to its terms, incorporated the same limitation. The applicable committee report sheds no light one way or another.[16] There is no inconsistency between the object of the 1937 Act to limit the sweeping exemption of all lands, granted by the 1936 Act, to homestead lands, and a purpose to enlarge the exemption accorded to the relatively small amount of homestead lands so that it would apply to restricted homesteads passing to Indian heirs or grantees. The fact that extensive changes in language were made in the 1937 Act is persuasive, moreover, that a change in sense from the presumed personal exemption of the 1936 Act was intended. If the only object of the 1937 Act was to limit the application of the 1936 Act (with its assumed personal exemption) to homesteads, that purpose could have been accomplished simply by substituting the word "homesteads" for the word "lands." We cannot accept the view that the substantial changes in language were only matters of style. Furthermore, it has not been suggested that respondents, as takers from the original purchaser, were incompetent to designate the lands as a homestead under the 1937 Act. If they could do that, as we and apparently the Secretary of the Interior think they could,[17] it would seem to follow that, having properly designated their homestead under the Act, they are entitled to the tax exemption afforded restricted homesteads by the Act until Congress otherwise directs.

---

[16] S. Rep. 332, 75th Cong., 1st Sess.

[17] The Secretary approved respondents' designation. See Note 12, *ante.*

The Acts of 1936 and 1937 are constitutional. From almost the beginning, the existence of federal power to regulate and protect the Indians and their property against interference even by a state has been recognized. Cf. *Worcester* v. *Georgia,* 6 Pet. 515. This power is not expressly granted in so many words by the Constitution, except with respect to regulating commerce with the Indian tribes, but its existence cannot be doubted. In the exercise of the war and treaty powers, the United States overcame the Indians and took possession of their lands, sometimes by force, leaving them an uneducated, helpless and dependent people, needing protection against the selfishness of others and their own improvidence. Of necessity, the United States assumed the duty of furnishing that protection, and with it the authority to do all that was required to perform that obligation and to prepare the Indians to take their place as independent, qualified members of the modern body politic. This was classically summarized in *United States* v. *Kagama,* 118 U. S. 375, 384–85:

"From their [the Indians'] very weakness and helplessness, so largely due to the course of dealing of the Federal Government with them and the treaties in which it has been promised, there arises the duty of protection, and with it the power. This has always been recognized by the Executive and by Congress, and by this court, whenever the question has arisen.

. . . . .

"The power of the General Government over these remnants of a race once powerful, now weak and diminished in numbers, is necessary to their protection, . . . It must exist in that government, because it never has existed anywhere else, because the theater of its exercise is within the geographical limits of the United States, because it has never been denied, and because it alone can enforce its laws on all the tribes."

After 1871, Congress turned from regulating Indian affairs by treaties to regulation by agreement and legislation. The plenary character of this legislative power over various phases of Indian affairs has been recognized on many occasions.[18] One aspect of this legislative program commenced with the General Allotment Act of 1887, 24 Stat. 388, followed by various other allotment acts dealing with specific tribes,[19] whereby Congress embarked upon a policy of assimilating the Indians through dissolution of tribal governments and the compulsory individualization of Indian land.[20] To lessen the difficulty of the period of transition and to protect the allottees' interest in their lands, Congress, by the device of the trust patent or a restricted fee, denied them the power to alienate or encumber their lands for fixed periods of time, subject to extension—denials which were sustained as proper exercises of Congressional power. *Tiger* v. *Western Investment Co.,* 221 U. S. 286, 310–17; *Brader* v. *James,* 246

---

[18] See *United States* v. *Kagama, supra; Choctaw Nation* v. *United States,* 119 U. S. 1, 27; *Stephens* v. *Cherokee Nation,* 174 U. S. 445, 486; *Lone Wolf* v. *Hitchcock,* 187 U. S. 553, 566–68; *Tiger* v. *Western Investment Co.,* 221 U. S. 286, 310–17; *United States* v. *Sandoval,* 231 U. S. 28, 45–47; *Brader* v. *James,* 246 U. S. 88, 96; *Sunderland* v. *United States,* 266 U. S. 226, 233–34; *United States* v. *Ramsey,* 271 U. S. 467, 469, 471; *United States* v. *McGowan,* 302 U. S. 535, 538–39; *Board of Comm'rs* v. *United States,* 308 U. S. 343, 349.

[19] Wosey John Deere received her allotment under an agreement negotiated with the Creeks by the Dawes Commission and incorporated into the Act of March 1, 1901, 31 Stat. 861, as amended by the supplemental agreement of June 30, 1902, 32 Stat. 500. See also § 19 of the Act of April 26, 1906, 34 Stat. 137, 144; Act of May 27, 1908, 35 Stat. 312; and Act of May 10, 1928, 45 Stat. 495.

[20] Allotments in severalty were halted by the Wheeler-Howard Act of June 18, 1934, 48 Stat. 984, and by the Oklahoma Welfare Act of June 26, 1936, 49 Stat. 1967. These and other recent statutes reflect a change in policy, the theory of which is that Indians can better meet the problems of modern life through corporate, group, or tribal action, rather than as assimilated individuals.

U. S. 88, 96; *Sunderland* v. *United States,* 266 U. S. 226, 233–34. The obligation and the power of the United States to protect and preserve those restricted allotted lands for the Indian owners has been recognized, *Heckman* v. *United States,* 224 U. S. 413, and they were held immune from state taxation as instrumentalities by which the United States provided for the welfare and education of its Indian wards. *Rickert* v. *United States,* 188 U. S. 432.[21] It has also been held by the lower federal courts that proceeds from the sale or lease of restricted allotted lands are immune from state taxation. See *United States* v. *Thurston County,* 143 F. 287; *National Bank of Commerce* v. *Anderson,* 147 F. 87. When this Court came to consider the tax status of lands of the character here involved, that is, lands purchased for an Indian from the trust or restricted proceeds of his restricted allotted land, it said that, "In a broad sense all lands which the Indians are permitted to purchase out of the taxable lands of the state in this process of their emancipation and assumption of the responsibility of citizenship, whether restricted or not, may be said to be instrumentalities in that process." Lands so purchased, however, were held to fall within that class of "instrumentalities which, though Congress may protect them from state taxation, will nevertheless be subject to that taxation unless Congress speaks." *Shaw* v. *Gibson-Zahniser Oil Corp.,* 276 U. S. 575, 580–81.

As a result of the *Shaw* decision, Congress spoke in the Act of 1936 and the amendment of 1937, which were intended to protect the Indians in their land purchases from restricted funds and to keep faith with them because of the implied or express representations that those lands

---

[21] The land involved in the *Rickert* case was a trust allotment, rather than a restricted fee. The power of Congress over both types of allotments, however, is the same. See *United States* v. *Ramsey,* 271 U. S. 467, 471.

were tax exempt.[22]   The clear implication of the *Shaw* case is that those Acts are valid exercises of Congressional power, and we so hold.   They are appropriate means by which the federal government protects its guardianship and prevents the impairment of a considered program undertaken in discharge of the obligations of that guardianship.   The fact that the Acts withdraw lands from the tax rolls and may possibly embarrass the finances of a state or one of its subdivisions is for the consideration of Congress, not the courts.   Cf. *Federal Land Bank* v. *Bismarck Co.,* 314 U. S. 95, 104.   Also, it is immaterial that respondents are citizens, because it is settled that the grant of citizenship to the Indians is not inconsistent with their status as wards whose property is subject to the plenary control of the federal government.   See *Tiger* v. *Western Investment Co.,* 221 U. S. 286, 312–17; *Brader* v. *James,* 246 U. S. 88, 96.   It rests with Congress to determine when the guardianship relation shall cease. *Tiger's* case, *supra; United States* v. *Ramsey,* 271 U. S. 467, 469; *United States* v. *McGowan,* 302 U. S. 535, 538. Thus far, Congress has not terminated that relation with respect to the Creek Nation and its members.   That Nation still exists,[23] and has recently been authorized to resume some of its former powers.   Act of June 26, 1936, 49 Stat. 1967.   And although the Creek tribal rolls were closed on March 4, 1906,[24] Congress has recognized that un-enrolled Creeks of the half blood or more are tribal

---

[22] See H. Rep. 2398, S. Rep. 2168, 74th Cong., 2d Sess.   See also the Meriam Report to the Secretary of the Interior on the Problem of Indian Administration (Brookings Institute, 1928), pp. 795–98.

[23] The Act of March 1, 1901, 31 Stat. 861, and the supplemental agreement of June 30, 1902, 32 Stat. 500, provided for the dissolution of the Creek Tribe on March 4, 1906, but this provision was revoked by the joint resolution of March 2, 1906, 34 Stat. 822, and § 28 of the Act of April 26, 1906, 34 Stat. 137, 148.

[24] Section 2 of the Act of April 26, 1906, 34 Stat. 137.

Indians subject to federal control.[25]  Respondents fall in this class.

We have considered the other contentions raised by petitioners and find them without merit.  The judgment below is correct in the matters appealed from and is therefore

*Affirmed.*

MR. JUSTICE REED took no part in the consideration or decision of this case.

MR. JUSTICE RUTLEDGE:

I concur in the result and also in the opinion except as it relates to the taxes for 1938 and thereafter, levied and collected under the 1937 Act.  I agree that the exemption extended for these years to Wosey John Deere's grantees, but for different reasons and with the limitation, which I think should be stated, that under presently effective legislation the exemption extends only to 1956.

As I understand the ruling, the opinion grounds the exemption for grantees squarely on the 1937 Act, without reference to whether they were also exempt under the 1936 Act, a question not decided.  With that I cannot agree.  The later statute amended the earlier one.  Both its terms and its legislative history [1] show it had only one purpose.  That was to cut down the amount of land exempted.  "All homesteads" took the place of "all lands." There were other changes in language, but they were matters of style, not of substance.  There is not a word in the Act of 1937 itself, or in the Committee reports to Congress, to show that any other change was in mind.  I find,

---

[25] See Act of January 27, 1933, 47 Stat. 777; Act of Feb. 11, 1936, 49 Stat. 1135; Act of June 26, 1936, 49 Stat. 1967; Act of December 24, 1942, c. 813, 56 Stat. 1080.

[1] See H. R. Rep. No. 562, 75th Cong., 1st Sess.; S. Rep. No. 332, 75th Cong., 1st Sess.

therefore, no evidence of purpose to enlarge the protected class at the same time the amount of land exempted was being reduced.  Nor is mere absence of language expressly limiting the exemption to a class defined in the Act a sufficient basis for implying an intent to enlarge the protected class.  Nullifying the power of a state to tax land within its borders held by or for private individuals is too important and delicate a matter to hang on such an implication.  In my opinion, therefore, the sole purpose and effect of the 1937 Act was to reduce the quantity of land for which exemption could be claimed.  Consequently, if grantees were within the benefit, it was because they were so by virtue of the 1936 Act.

A literal reading of that Act possibly would lead to the conclusion that grantees were excluded and the protection was personal to the Indian with whose funds the lands were purchased.  But the language is not absolutely conclusive to this effect, and, in my opinion, the legislative history [2] shows that the purpose again was not to enlarge or restrict the classes to which the benefit applied, but rather was to bring within the scope of preëxisting exemptions lands not covered by them.  Any other view would create as to the lands covered by the 1936 Act, which were acquired with restricted funds, a different and a preferred exemption as compared with that applicable to originally allotted lands, from the sale of which in large part the funds were derived.  No intent can be imputed to Congress to give the substituted lands preferential treatment as compared with original allotments.  The language does not require this, and nothing in the legislative history gives a basis for believing it was intended.  There is no sufficient reason in either for thinking that Congress

---

[2] See H. R. Rep. No. 2398, 74th Cong., 2d Sess.; S. Rep. No. 2168, 74th Cong., 2d Sess.  See also 80 Cong. Rec. 9159 and Meriam Report to the Secretary of the Interior on the Problem of Indian Administration (Brookings Institute, 1928) 795–8.

intended to create new classes of beneficiaries or new kinds of exemptions, whether in duration or otherwise. There was a preëxisting and defined general policy in both respects, no problem of either sort was presented by the situation the Act was intended to cure, and the sole purpose, in my opinion, was to make sure the preëxisting exemptions would extend to the lands specified in the Act. Accordingly, whether grantees were exempted and, if so, for how long is to be determined not by implication or construction from the terms of the 1936 Act alone, but by reference to the law as it existed in respect of grantees of original allottees prior to 1936.

There is no need to go back of 1928, except to say that, for our purposes, the effect of prior legislation was that grantees of original allottees were not within the existing tax exemptions,[3] which were, for the most part, to expire at the latest in 1931.[4] In some instances, restrictions extended to lands held by heirs of allottees, but for the limited period.[5] In 1928, Congress extended existing restrictions on some lands—both allotted and inherited—to 1956, but at the same time removed existing restrictions on others. 45 Stat. 495. The existing tax exemption was cut down in scope to one hundred sixty acres of each Indian's holding, but was also extended more clearly to cover the land in the hands of "any full blood Indian heir or devisee," though not beyond 1956. 45 Stat. 495, as amended by 45 Stat. 733–4.

In 1933, probably by reason of the discovery of oil on Indian lands, consequent sale or lease of original allotments under the direction of the Secretary of the Interior,

---

[3] *Cf.* Act of June 30, 1902, c. 1323, § 16, 32 Stat. 500, 503; Act of April 26, 1906, c. 1876, § 19, 34 Stat. 137, 144; Act of May 27, 1908, c. 199, §§ 4, 9, 35 Stat. 312, 313, 315; Act of April 12, 1926, c. 115, 44 Stat. 239.

[4] 34 Stat. 144; 35 Stat. 315; 44 Stat. 239.

[5] See 35 Stat. 315; 44 Stat. 239.

and numerous suits by Indians claiming the proceeds free from his restrictive power, Congress enacted another statute, 47 Stat. 777, which made all Indian funds then in or later coming to the Secretary's hands restricted. It contained the following proviso, which is the last word, for our purposes, on exemption of Five Civilized Tribe Indian lands prior to 1936:

*"Provided,* That where the entire interest in any tract of restricted and tax-exempt land belonging to members of the Five Civilized Tribes is acquired by inheritance, devise, gift, or purchase, with restricted funds, by or for restricted Indians, such land shall remain restricted and tax-exempt during the life of and as long as held by such restricted Indians, but not longer than April 26, 1956. . . . *Provided further,* That such restricted and tax-exempt land held by anyone, acquired as herein provided, shall not exceed one hundred and sixty acres."

In a number of respects, the meaning of the provision is unclear. But, without attempt to clarify them, the general purpose seems to have been to exempt lands belonging to members of the Five Civilized Tribes during their lives, but not beyond 1956 and not exceeding 160 acres, if "acquired by inheritance, devise, gift, or purchase, with restricted funds, by or for such restricted Indians." The proviso is awkwardly drawn, and some of the language could be taken to limit the exemption to the Indian with whose restricted funds the lands are acquired. But other language contradicts this and the legislative history shows it was contemplated the exemption would extend to heirs, devisees, donees and purchasers with restricted funds.[6] In short, as to the lands covered, Indian heirs, devisees, donees and grantees were within the protection. That the proviso covers directly the lands in question in the hands

---

[6] See H. R. Rep. No. 1015, 72d Cong., 1st Sess.; S. Rep. No. 873, 77th Cong., 1st Sess.; see also 75 Cong. Rec. 8163, 8170.

of Wosey John Deere's grantees may be doubted.[7] But, whether or not the statute applies specifically to this case, it shows the latest phase of Congressional policy, prior to 1936, as to the kind of exemption given to members of the Creek Nation and the persons entitled to its benefit.

In this background, the 1936 Act was adopted. In my opinion, it incorporated the previously existing exemption, as it related to duration and grantees, but extended it to "all lands" rather than merely the homestead. The 1937 Act returned to the homestead limit, but without change in other respects. In my view, therefore, and for these reasons, the grantees of Wosey John Deere were entitled to the benefit of the exemption, but, unless it is extended further by Congress, only to 1956.

MR. JUSTICE ROBERTS joins in this opinion.

---

[7] They are homestead lands. They were bought with her restricted funds. She, if anyone, was a "restricted Indian," though that term is new in this Act and unclear. She acquired the lands by purchase. Her children took them by deed, whether by gift or by "purchase" is not material. They, too, were "restricted Indians," if she was. At any rate, they were full blood. All these things would fit the statute to the present case. On the other hand, the tax exemption in the proviso apparently extends only to newly acquired lands which prior to their acquisition were tax exempt and restricted. See 75 Cong. Rec. 8170. Nothing in the record indicates that the lands here involved were either tax exempt or restricted when Wosey John Deere purchased them. However, the precise significance of the apparent requirement that the lands shall have been tax exempt before they were acquired is obscured by the context of the proviso in a statute addressed primarily to the problem of restricting funds (in the hands of the Secretary) obtained largely from the sale of interests in restricted lands.