**Gerry CONROY, Appellant,**

v.

**Evelyn Sybil CONROY, Appellee.**

**No. 77–1343.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 17, 1977.

Decided April 20, 1978.

Charles H. Whiting, Rapid City, S. D., for appellant.

* Judge Webster heard the arguments, participated in consideration of the case, and agreed to the disposition here made.

** TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

Mario Gonzalez, Martin, S. D., for appellee.

Maryann Walsh, Atty., Dept. of Justice, Washington, D. C., for amicus curiae, United States; James W. Moorman, Acting Asst. Atty. Gen., Edmund B. Clark, Jacques B. Gelin, Attys., Dept. of Justice, Washington, D. C., on the brief.

Richard Schifter and Jay R. Kraemer of Fried, Frank, Harris, Shriver & Kampelman, Washington, D. C., filed brief of amicus curiae, Oglala Sioux Tribe.

Before WEBSTER * and HENLEY, Circuit Judges, and TALBOT SMITH,** Senior District Judge.

TALBOT SMITH, Senior District Judge.

The matter before us is an appeal, upon certification, of an interlocutory order granting partial summary judgment in favor of the plaintiff.[1] Finding no merit in any of the issues raised, we affirm the judgment of the District Court and remand.

This case had its origins in a divorce action filed in the Oglala Sioux Tribal Court of the Pine Ridge Indian Reservation some eight years ago. Both husband and wife are members of the Oglala Sioux Tribe. The Tribal Judge, Special Judge Harold R. Hanley, found

> That by the joint toil, work, effort, and forbearance of both Plaintiff and Defendant during 32 years of marriage they accumulated approximately 1,700 acres of land which at the present time is held in trust by the United States of America in the name of Gerry Conroy, Defendant herein.
>
> *   *   *   *   *   *
>
> That by the joint toil, work, effort, and forbearance of both Plaintiff and Defendant during 32 years of marriage they accumulated 92 head of cattle.[2]

1. 28 U.S.C. § 1292(b) confers our jurisdiction.

2. *Evelyn Conroy v. Gerry Conroy*, (Oglala Sioux Tribal Court March 14, 1975).

Upon a finding of abuse by the husband, plaintiff-wife was granted a divorce and was awarded roughly half of the land[3] and cattle accumulated through their joint efforts. Unable to enforce the decree in her favor because, allegedly, of violation of her civil rights, she sought the aid of the District Court. We affirm the ruling[4] of the District Court[5] in her favor.

■ First, as to jurisdiction. The District Court found, and we agree, that plaintiff properly alleged a cause of action under 42 U.S.C. § 1985(3), charging a conspiracy directed against her because of her race and sex. The allegations as to conspiracy are both specific and substantial, *Hagans v. Lavine*, 415 U.S. 528, 534–38, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974), and jurisdiction exists under 28 U.S.C. § 1343, with pendent jurisdiction as to the tribal cause of action under the teachings of *Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976) and related cases. We do not act as an appellate tribunal for a tribal divorce court. The District Court correctly ruled that "[t]his Court lacks any general power to review and oversee the Tribal Courts in their resolution of questions concerning the authority and power of Tribal Courts." *Conroy v. Frizzell*, 429 F.Supp. 918, 925 (D.S.D.1977).[6]

It is argued, also, that the District Court lacks jurisdiction because the United States, a necessary party, has not consented to be sued.

Under Rule 19(b), Fed.R.Civ.P., the basic test for indispensability is one of "equity and good conscience," criteria which obviously will vary from case to case, depending upon the circumstances thereof. *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968); *Fetzer v. Cities Service Oil Co.*, 572 F.2d 1250 (8th Cir. 1978); *Helzberg's Diamond Shops, Inc. v. Valley West Des Moines Shopping Center, Inc.*, 564 F.2d 816 (8th Cir. 1977).[7]

Among the factors to be considered by the court, listed in Rule 19(b),[8] we find none mandating joinder upon such facts as those before us. Particularly appropriate to this case is the fourth factor of Rule 19(b), namely, "Whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder." Here the plaintiff has had a valid decree for many years from a court of competent jurisdiction, yet she has been unable to realize the benefits of her decree and, in fact, is subsisting on public welfare. If there is still another remedy beyond the

---

**3.** The land is now held in trust by the United States under the provisions of the General Allotment Act of February 8, 1887, 24 Stat. 388, as amended, 25 U.S.C. § 331 *et seq.*, in the name of Gerry Conroy. The land awarded had been acquired by purchase during the marriage.

**4.** The opinion of the District Court is reported at *Conroy v. Frizzell*, 429 F.Supp. 918 (D.S.D. 1977).

**5.** The Honorable Andrew W. Bogue, United States District Judge for the District of South Dakota.

**6.** This Court reaffirmed, in *United States v. Walking Crow*, 560 F.2d 386, 388–89 (8th Cir. 1977) that

The tribes of Sioux Indians residing in the Dakotas have always been recognized as quasi-sovereign nations with the inherent powers of sovereignty, except to the extent that those powers have been taken away from them by the exercise by Congress of its paramount power in the area or by treaty;

that the tribal courts are not the creations of the federal Constitution or of federal statutes, and that their jurisdiction is inherent with respect to all matters that have not been taken away from them.

**7.** Textual discussions will be found in 3A Moore's Federal Practice ¶ 19.07–2[0] (1977); 7 C. Wright and A. Miller, *Federal Practice and Procedure*, § 1607 (1972).

**8.** The factors to be considered under Rule 19(b) are:

[F]irst, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

one she is asserting its adequacy is not made clear to us.[9]

■ We find no indispensability of the United States upon these facts,[10] nor other defect as to jurisdiction.

A resume of the procedural background of the case before us is necessary to an understanding of the issues here presented.

The Tribal divorce proceedings which culminated in the March 14, 1975 Decree of Divorce and Findings of Fact and Conclusions of Law were fraught with confusion and disorder. On May 17, 1971 Judge Hanley [had] entered an Order granting Plaintiff the use and possession of approximately 320 acres of land. In late 1971, Defendant Stanley D. Lyman, who was then the Superintendent of the Pine Ridge Agency of the Bureau of Indian Affairs, wrote a letter to Defendant Theodore Tibbetts, who was then Chief Judge of the Oglala Sioux Tribal Court. The letter asserted that Judge Hanley as Special Tribal Judge lacked authority to make an award of the trust land holdings of Gerry Conroy.

Thereafter, Judge Tibbetts apparently entertained a separate divorce action in Tribal Court between Plaintiff and Gerry Conroy, and entered a decree of divorce. On April 30, 1975 Defendant Dorothy Richards, who was then a Judge of the Oglala Sioux Tribal Court, entered an Order which purported to vacate Judge Hanley's decree of March 14, 1975 and uphold Judge Tibbetts' divorce decree.[11]

In an attempt to clarify the confusion created by "conflicting and, inconsistent Tribal Court proceedings and orders"[12] plaintiff initiated an action in the District Court (CIV 75–5033) against the Oglala Sioux Tribal Court and Tribal Judges Theodore Tibbetts and Dorothy Richards. It concluded when

each of the parties to it stipulated that Judge Hanley's Divorce Decree and Findings of Fact and Conclusions of Law entered March 14, 1975 were final Tribal Court Judgments, and that Judge Tibbetts' Divorce Decree and Judge Richards' Order upholding it were withdrawn and set aside. [The District Court] thereupon permanently enjoined the Oglala Sioux Tribe, the Oglala Sioux Tribal Court, Theodore Tibbetts and Dorothy Richards from conducting any further proceedings or filing any further papers in regard to Plaintiff's divorce action in Tribal Court.[13]

This effort to clarify was unavailing. Despite the foregoing proceedings, Gerry Conroy and the Bureau of Indian Affairs,

---

**9.** *Cf., Fetzer v. Cities Service Oil Co.*, 572 F.2d 1250 at 1254, (8th Cir. 1978).

**10.** In a case collateral to the instant case, *Evelyn Conroy v. Theodore "Red" Tibbetts, Chief Judge of the Oglala Sioux Tribe*, (Oglala Sioux Court of Appeals December 16, 1974), Judge Pourier, of the Tribal Court of Appeals, held that:

We believe that the United States can administer its trust responsibility without being joined in every divorce action in tribal court involving the division of trust land. Certainly, the trust responsibility of the United States to the Oglala Sioux should be administered in accordance with and in light of the Act of February 28, 1877, *supra*, the Indian Reorganization Act, the Constitution and By-laws of the Oglala Sioux Tribe, the Revised Law and Order Code of the Oglala Sioux Tribe, and other relevant tribal and federal laws. The Oglala Sioux Tribal Court should not be hampered in its duty to regulate marriage relationships and controversies. We believe that the United States can administer

its trust responsibility and other responsibilities assumed under Treaties and Agreements, not only to individual allottees and members of the tribe, but to all members of the tribe, by honoring any divorce decree issued by the tribal court, and if trust land is divided, to divide the land in accordance with the decree.

We hold that the Oglala Sioux Tribal Court is vested with proper jurisdiction to order a division of trust land acquired during marriage between two enrolled members of the Oglala Sioux Tribe who are parties to a divorce action, i. e., the *Conroy* case. Further, we hold that such divorce action may be filed and adjudicated in the Oglala Sioux Tribal Court without joining the United States as an indispensable party to the action.

**11.** *Conroy v. Frizzell*, 429 F.Supp. 918 at 920.

**12.** *Id.*, at 921.

**13.** *Id.*, at 921.

through its local officers, failed "to recognize any validity in Judge Hanley's order that Gerry Conroy convey trust lands to Plaintiff,"[14] with the result that the action before us was filed.

In view of the previous history of the case the District Court addressed a letter to the parties which pointed out the delays previously encountered and the complexity of the factual and legal issues presented. The letter observed that "a methodical consideration of important points is most difficult in the midst of this complexity" and suggested that the dispute over the trust land involved be resolved before proceeding to other issues in the case.[15]

At the subsequent hearing, the trial court, cutting through collateral issues, described cogently, if inelegantly, the "guts of whole case" in the following terms:

> There are actually five major questions that I have spelled out, but they boil down to two: number 1, whether [Judge] Hanley had any authority to do what he did; number two, assuming for the moment that he did have authority, was the BIA obligated to follow what he said should be done?
>
> This isn't the case on the merits. This only goes to a very narrow question. Mr. Hanley heard, I assume, all of these facts and he made his decision. I would have no authority to rank over what Mr. Hanley did, whether he was justified or not justified in coming to the conclusion to give Mrs. Conroy some land. You see, I am not a divorce court.

My only concern right at this point is either approve or disapprove what Mr. Hanley did based on his legal right to do so or make a decision as to the obligation of the BIA to follow Judge Hanley's order as entered. These are the very narrow issues that I am trying to keep us within today. It is not a case on its merits, that is, going into whether or not there was justification for giving Mrs. Conroy a share of that land.[16]

At the hearing the parties stipulated in open court that the issues set out in the Court's previous letter might be "dealt with on a summary judgment basis."

The Court concluded, subsequent to hearing, that the plaintiff had an enforceable property interest in her former husband's land, ordered that

> Defendant Gerry Conroy forthwith make and file an application with the Secretary of the Interior, pursuant to 25 C.F.R. § 121.23, for the transfer of the beneficial title in and to the above-described real property to the name of Evelyn Conroy, Plaintiff herein,

and, further, that

> the Secretary of the Interior or his duly authorized representative, give full and fair consideration to the above-ordered application under the provisions of 25 C.F.R. §§ 121.23 and 1.21.25(d), with due regard for the Findings of Fact and Conclusions of Law and the Decree of Divorce entered by Special Judge Harold Hanley of the Oglala Sioux Tribal Court,

14. *Id.*, at 921.

15. Letter of December 29, 1976, District Court to counsel, *Conroy v. Frizzell, supra.*

> To analyze this case intelligently we think it is necessary to separate the dispute over the trust land from the dispute over the cattle. There are several reasons for this separation. First, the dispute over the cattle involves extensive fact-finding; the dispute over the land turns primarily, perhaps entirely, on a legal question. Second, the dispute over the cattle has brought in many defendants who have nothing whatever to do with the land dispute. Third, several defendants, who were so named solely by virtue of alleged participation in a conspiracy involving cattle, have by their answers brought up legal questions far removed from anything that needs to be decided in order to settle the land dispute. For these reasons it appears desirable at this time to bifurcate. All legal questions concerning title to and use of the trust land in dispute will be dealt with forthwith and fact-finding (we anticipate none) will likewise be done as soon as possible; the dispute over the cattle will be set aside until this Court has done all that it can to resolve the issues of title to and use of the trust land.

16. Transcript of Hearing, March 21, 1977, at 12–13, *Conroy v. Frizzell, supra.*

and the Memorandum Opinion of this Court on file herein.[17]

It is to be noted that the above decree does not purport, in and of itself, to order any conveyance of land, but rather to order an application to the Secretary to be made.[18] Nor does it by its terms, or reasonable construction thereof, purport to affect the title which the United States, as trustee, holds in the real property.

At this point defendant Gerry Conroy filed an application for leave to appeal the Court's interlocutory orders, alleging errors upon two grounds:

(1) The Oglala Sioux Tribe has adopted a constitution which prescribes the powers of the Tribal Court, including those in connection with divorce actions, which constitution does not authorize the Tribal Court in a divorce action to decree a division of the real property owned by the parties or to order a party to the action to convey real property to the other party.

(2) The subject land is what is known as "Indian Trust Land", being land allotted for the use and benefit of a particular Indian, in this case, Defendant Gary [sic] Conroy but title to which is held in trust by the United States and will not vest in the allottee until the end of the trust period, usually 25 years and any extension thereof. The title being in the United States, the Tribal Court, in a divorce action, lacks jurisdiction to decree a division or distribution of the said land and cannot accomplish that end by the indirection of ordering a party to the action to petition the Secretary of the Interior to convey the land to the other party.

An adequate discussion of these issues requires an examination of two major segments of federal Indian legislation: the General Allotment Act [19] (hereafter the Allotment Act) and the Indian Reorganization Act [20] (hereafter the IRA).

The purpose of the Allotment Act was to assimilate the Indian into the mainstream of American life [21] and to protect him from the wiles of those who coveted his land. To accomplish, in part, this assimilation, the President was authorized under the Act to parcel tribal land to individual tribal members in "allotments" of 40, 80, or 160 acres.[22] The fee title to this land is held in trust by the United States for the allottee [23] and is not subject to alienation by him except with the consent of the United States Government.[24]

---

**17.** Partial Summary Judgment and Order of April 6, 1977, *Conroy v. Frizzell, supra.*

**18.** The position of the United States has not been prejudiced. *Cf.,* Fed.R.Civ.P. 19(b), *supra.*

**19.** *See* n. 3 hereof. An extensive bibliography on the Allotment Act will be found in I. Sutton, *Indian Land Tenure* (1968). The treatment in D. Otis, *The Dawes Act and the Allotment of Indian Land,* New edition, (1973) [hereafter Otis] is comprehensive and often quoted. *See also,* F. Cohen, *Handbook of Federal Indian Law,* (1942) the standard work in the field, and M. Price, *Law and the American Indian,* 531–72 (1973).

**20.** 25 U.S.C. § 461 *et seq.* Detailed discussion may be found in Comment, *Tribal Self-Government and the Indian Reorganization Act of 1934,* 70 Mich.L.Rev. 955 (1972) [hereafter *Tribal Self-Government* ]. *See also,* Commission on the Rights, Liberties and Responsibilities of the American Indian, *The Indian, America's Unfinished Business,* 20–22 (W. Brophy and S. Aberle, ed. 1966) [hereafter Brophy

Commission] and Cohen, *Handbook of Federal Indian Law, supra,* at 84–87.

**21.** The Discussions in Otis, *supra,* Ch. II; Frizzell, *Evolution of Jurisdiction in Indian Country,* 22 Kan.L.Rev. 341 (1974); and *Tribal Self-Government, supra,* at 959–61 are particularly helpful.

**22.** 25 U.S.C. § 331. "Surplus" reservation land was thus made available to homesteading settlers. *See,* Brophy Commission, *supra,* at 18–20; *Tribal Self-Government, supra,* at 959.

**23.** The original trust periods were set at 25 years, 25 U.S.C. § 348, but their duration has been extended by Presidential Order. Currently, statute provides that the trust periods shall be continued until further direction by Congress. 25 U.S.C. § 462.

**24.** 25 U.S.C. § 348. Other sections, not here relevant, provide for powers of eminent domain, lease, and inheritance of trust lands. *See, e. g.,* 25 U.S.C. §§ 341 and 357, 348, and 372.

The provision of the Allotment Act against alienation, save with the approval of the Secretary, arose from the Indian's need for protection from the machinations of others in derogation of the Indian's best interests. The Supreme Court has observed that

> [H]ere we deal with a special kind of property right under allotments from the Government. The right is not absolute; the allottee is the beneficial owner while the Government is trustee. 25 U.S.C. § 348. The Indian's right to make *inter vivos* dispositions is limited and requires approval of the Secretary. The legislative history reflects the concern of the Government to protect Indians from improvident acts or exploitation by others, and comprehensive regulations govern the process of such *inter vivos* dispositions.

*Tooahnippah v. Hickel,* 397 U.S. 598, 609, 90 S.Ct. 1316, 1323, 25 L.Ed.2d 600 (1970).[25]

"The general theory underlying the allotment policy was that an individual Indian who owned his own plot of land would thereby be transformed into an independent farmer or livestock operator."[26] The allotment policy was unsuccessful,[27] and the IRA ended it completely, in 1934, as it applied to tribally owned land.[28] The purpose of the IRA was remedial, to "encourage Indians to revitalize their self-government."[29]

By it the United States recognized the importance of Indian communal life as an agency for preserving and encouraging social controls and values on which the people could base innovations made by themselves. To this end it sought to transfer the initiative from the B.I.A. to the tribesmen concerned.

Besides stopping the alienation and allotment of tribal land, this act authorized appropriations to purchase new holdings, established a system of federal loans, confirmed Indian self-government, and provided for the setting up of tribal business organizations to be chartered as federal corporations.[30]

For our purposes it is significant to note that under the provisions of the IRA, a tribe was authorized to adopt a constitution for self-government[31] and to form a corporation to manage tribal resources.[32] Though Congress provided the framework by which a tribe would exercise its governmental authority,[33] and the exercise of such authority "remains subject to ultimate federal control,"[34] the IRA recognizes and "reconfirms in an accepting tribe all of the powers which the tribe possessed by virtue of its quasi-sovereign status under previous law."[35] Among those powers retained, the

---

**25.** *See also, Squire v. Capoeman,* 351 U.S. 1, 9, 76 S.Ct. 611, 616, 100 L.Ed. 883 (1956):

> The purpose of the allotment system was to protect the Indians' interest and 'to prepare the Indians to take their place as independent, qualified members of the modern body politic.' *Board of Commissioners v. Seber,* 318 U.S. 705, 715 [63 S.Ct. 920, 87 L.Ed. 1094] [1943].

**26.** *Tribal Self-Government, supra,* at 959. *See also,* Otis, *supra,* at 7.

**27.** "The greater number of testimonies to the failure of the allotment system suggest that the fundamental obstacle to the policy's success lay in the Indians' attitude toward civilized economy." Otis, *supra,* at 51. As a result of the Allotment Act, tribal landholdings were cut drastically, without accomplishing the hoped for result of the realization of the Indian's economic independence. Brophy Commission, *supra,* at 20.

**28.** 25 U.S.C. § 461. *See* Sutton, *Indian Land Tenure, supra,* at 61.

**29.** *Cheyenne River Sioux Tribe v. Andrus,* 566 F.2d 1085, 1086 (8th Cir. 1977).

**30.** Brophy Commission, *supra,* at 20–21. *See also* Cohen, *Handbook of Federal Law, supra,* at 84–86; *Tribal Self-Government, supra,* at 964–69.

**31.** 25 U.S.C. § 476.

**32.** 25 U.S.C. § 477.

**33.** *Cheyenne River Sioux Tribe v. Andrus, supra,* at 1088–89.

**34.** *United States v. Wheeler,* —— U.S. —— at ——, 98 S.Ct. 1079 at 1088, 55 L.Ed.2d 303 (1978).

**35.** *Cheyenne River Sioux Tribe, supra,* at 1086 n. 4.

power of a tribe to regulate the domestic relations of its members, historically well established, remains undisturbed. *Fisher v. District Court,* 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976); *United States v. Quiver,* 241 U.S. 602, 36 S.Ct. 699, 60 L.Ed. 1196 (1916).[36]

■ We turn, now, to the defendant's allegations of error. His first claim is that the tribal divorce court lacked jurisdiction to order a division of real property in a divorce decree. This argument will not withstand analysis.

That the Oglala Sioux Tribe has retained its authority to regulate the marital relations of its members, can not seriously be contested. As stated by the Solicitor of the Interior Department, "[i]n defining and punishing offenses against the marital relationship, the Indian tribe has complete and exclusive authority in the absence of legislation by Congress on the subject." *Powers of Indian Tribes,* 55 Interior Dec. 14, 40 (1934). The jurisdiction of the tribal court derives, in turn, from the tribe's substantive powers of self-government. "If an Indian tribe has power to regulate the marriage relationships of its members, it necessarily has power to adjudicate, through tribunals established by itself, controversies involving such relationships." 55 Interior Dec. at 56.[37]

The Constitution of the Oglala Sioux Tribe [38] provides in Article V, Judicial Power, that:

§ 1. The judicial powers of the Oglala Sioux Tribe shall be vested in a court or courts which the tribal council may ordain or establish.

\* \* \* \* \* \*

§ 2. The judicial power shall extend to all cases involving only members of the

Oglala Sioux Tribe, arising under the constitution and by-laws or ordinances of the tribe, and to other cases in which all parties consent to jurisdiction.

As to domestic relations, Art. IV, § 1(q) of the Constitution empowers the Tribal Council

(a) To regulate the domestic relations of members of the tribe.

The Revised Code of the Tribe provides, with respect to marriage and divorce, that:

§ 27 Marriage and Divorces.

The Oglala Sioux Tribal Court shall have jurisdiction over marriages and divorces of the members of the Oglala Sioux Tribe as hereinafter defined. Indian custom marriage and divorce consummated after February 20, 1937 shall not be recognized.

\* \* \* \* \* \*

§ 42 Divorce.

The Oglala Sioux Tribal Court shall have authority to grant divorces to members of the Oglala Sioux Tribe whether the marriage was consummated under marriage license issued by the Superintendent or the Clerk of the Oglala Sioux Tribal Court, or under the license issued by a civil authority.

\* \* \* \* \* \*

§ 48 Separate Maintenance and Alimony.

Maintenance—Though judgment of divorce is denied, the court may in action for divorce, provide for maintenance of the wife and her children, or any of them, by the husband.

\* \* \* \* \* \*

Support. Where a divorce is granted for an offense of the husband, the Oglala Sioux Tribal Court may compel him to

---

**36.** See also, *United States v. Wheeler, supra,* —— U.S. at —— n. 18, 98 S.Ct. 1079; *Iron Crow v. Oglala Sioux Tribe,* 231 F.2d 89, 93 (8th Cir. 1956).

This is a matter of tribal self-government, *see United States v. Wheeler, supra,* rather than Congressional grant. "That Congress has in certain ways regulated the manner and extent of the tribal power of self-government does not

mean that Congress is the source of that power." *Id.,* —— U.S. at ——, 98 S.Ct. at 1088.

**37.** See also, Cohen, *Handbook of Federal Indian Law, supra,* at 145; *Iron Crow v. Oglala Sioux Tribe, supra,* at 94.

**38.** The Tribe accepted the provisions of the IRA, and the Tribal Constitution was adopted January 15, 1936, pursuant to 25 U.S.C. § 476.

provide for the maintenance of the children of the marriage, and to make such suitable allowance to the wife for her support during her life or for a shorter period as the Oglala Sioux Tribal Court may deem just, having regard to the circumstances of the parties respectively; and the Oglala Sioux Tribal Court may from time to time modify its orders in these respects.

\* \* \* \* \* \*

§ 51 Alimony for Support of Minors.

It shall be the duty of the court in all divorce actions to make adequate provisions for the support of the minor children and may require either or both parties to make provisions for their support and the decree entered shall provide for the support of said minor children and when filed with the Superintendent, it becomes a lien on all moneys and property that the court may recommend to the Secretary of the Interior that allotted lands and trust funds of property belonging to the parties be set aside for the use and benefit of the minors until they reach their majorities or unless changed by the Department.

We find nothing in the above provisions of the Code, or, indeed, in any other provision, or custom, to justify the position here asserted by the defendant. What we do see is a manifest regard for the maintenance and care of the spouse and children. There is no provision exempting any category of property, real or otherwise, from the power of the Court.

The Tribal Court here has made "suitable allowance" to the plaintiff for her support, "having regard to the circumstances of the parties respectively." The refusal of the proper authorities to implement the decree seems to lie in part in their misconception of the jurisdiction of the Tribal Court. There is no valid jurisdictional impediment to its decree. The point argued is without merit and we reject it.

In an alternative claim of error, defendant asserts that the provisions of the Allotment Act which forbid involuntary alienation of allotments [39] in trust have thereby removed trust land from the reach of the Tribal Court.

The defendant's reliance upon the Act as partial justification for his resistance to the Tribal Court's decree is misplaced. The purpose of the Allotment Act, as we have seen, was to protect the Indian. He had been the victim of overreaching and chicanery, particularly with respect to the land coveted by others. It was for this reason, among others, that the Secretary of the Interior was required to approve the Indian's *inter vivos* dispositions.

But upon a careful study of the Act, we find no warrant for construing it to negate a valid decree of a competent tribunal. It does not by any express provision, nor by any reasonable construction, support the denial to an Indian, here the plaintiff, of her rightful claim to valuable property. Moreover, the construction of the Allotment Act sought by the defendant is inimical to tribal self-government in the regulation of the marital relationship.[40] In sum, we find nothing in the Allotment Act warranting the conclusion that the defendant's interest in trust land here involved was beyond the jurisdiction of the Tribal Court to divide as decreed.

We do not here paint with a broad brush. The question of property settlement, if any, upon divorce granted in Tribal Court, is one of first impression and no authority thereon is cited to us, pro or con. We rule narrowly upon the property division made, having in mind the various interests to be considered. It was well said by a recent commentator that

> Corollary to the issue of fostering the development of tribal governments, development of tribal economic infrastructures, protection of tribal resources, and protection of civil rights, is the problem

---

**39.** *See* text keyed to n. 23 and n. 24, *supra*.

**40.** A statutory construction which would restrict a tribe's retained powers of limited sovereignty should not lightly be adopted. The tribal powers of self-government "are not such

powers as would necessarily be lost by virtue of a tribe's dependent status." *United States v. Wheeler, supra,* —— U.S. at ——, 98 S.Ct. at 1088.

of describing with accuracy the boundaries of jurisdictional authority of the federal, state, and tribal governments in matters involving Indian affairs. This is an exceedingly complex area of law. Three rules of general import govern the resolution of any jurisdictional clash: (1) Congress has plenary authority in matters involving Indian affairs; (2) tribal jurisdiction is an inherent incident of tribal sovereignty and is limited only to the extent that Congress has taken it away.[41]

The result sought by the defendant is grossly at variance with the modern aim, so far as feasible within constitutional and statutory limitations, of giving the Indians "the control of their own affairs and of their own property."[42]

The Order appealed from is affirmed and the case is remanded.

41.  Frizzell, *Evolution of Jurisdiction in Indian Country, supra,* at 348.

42.  *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 152, 93 S.Ct. 1267, 1272, 36 L.Ed.2d 114 (1973), quoting Senator Wheeler speaking of the Indian Reorganization Act in 78 Cong.Rec. 11125 (1934).