### HUBBELL v. COMMISSIONER OF IN-TERNAL REVENUE.

### WILDERMUTH v. SAME.

#### Nos. 9948, 9949.

Circuit Court of Appeals, Sixth Circuit.

July 2, 1945.

James I. Boulger, of Columbus, Ohio, for petitioners.

Paul F. Mickey, of Washington, D. C. (Samuel O. Clark, Jr., Sewall Key, J. Louis Monarch, and Paul F. Mickey, all of Washington, D. C., on the brief), for respondent.

Before SIMONS, ALLEN, and MARTIN, Circuit Judges.

MARTIN, Circuit Judge.

These consolidated proceedings, arising out of the same subject matter, present corresponding petitions filed by D. D. Hubbell and Elias F. Wildermuth, respectively, to review decisions of the tax court determining deficiencies in income tax for the year 1941, assessed against the petition-

ers in the respective amounts of $10,606.03 and $4,527.81. Section 165 of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 165 note, and Section 22(a) of the Internal Revenue Code of 1939, 26 U.S.C.A. Int.Rev. Code, § 22(a), are the pertinent Acts of Congress involved.

### Findings of Fact by the Tax Court

The findings of fact of the tax court set forth in detail the transactions with which we are concerned. The administrative tribunal found that during the year 1936, the White-Haines Optical Company, hereinafter called the optical company, was contemplating the purchase of annuities for both petitioners. Since the optical company had not reached a decision by October 1936, petitioner Hubbell, on October 2, 1936, made application to the Prudential Insurance Company of America for an annuity policy on his own life with payments of annuities to him commencing at his 70th birthday. The policy was to be issued for 40 premium units, calling for annual premiums of $4,000. In his application, petitioner named his daughter as the person entitled to receive death benefits.

Hubbell was president, treasurer and general manager of the optical company and had been associated with that company since 1901. Petitioner Wildermuth was secretary and sales manager of the optical company and had been employed by it since 1913. The only other officer of the optical company was a vice-president.

The optical company was controlled by the Bausch & Lomb Optical Company which owned 59 percent of its outstanding stock. Hubbell owned 8 percent and Wildermuth owned 2.3 percent of the stock. Hubbell, Wildermuth, Ballard, Haines, and two representatives of the Bausch & Lomb Optical Company comprised the board of directors of the company.

At a meeting of the directors of the White-Haines Optical Company on December 4, 1936, a resolution was adopted, authorizing the proper officers of the company to purchase premium refund annuity contracts for Hubbell and Wildermuth.[1]

Pursuant to this resolution, the optical company, on January 2, 1937, took over the policy previously secured by Hubbell, increasing the policy to 50 premium units with an annual premium of $5,000. The $4,000 previously paid by Hubbell to the Prudential Company was returned to him by that company and the optical company paid the Prudential Company the new policy premium of $5,000. On February 4, 1937, pursuant to the application of the optical company, an annuity policy was issued by the Prudential Insurance Company of America, payable to Wildermuth as the annuitant. The policy provided for 30 premium units with an annual premium of $3,000, and the annuity payments were to begin when Wildermuth reached the age of 70 years. Both policies contained the provisions set out in Footnote 2.[2]

---

[1] "Whereas, it is the desire of the Company to facilitate the retirement of certain of its executives and employees with compensation by providing suitable pension funds commensurate with the salaries of said executives and employees during the years preceding retirement, the years of service of such executives and employees being also considered in determining the amounts of such retirement pensions

"And Whereas, Daniel D. Hubbell is now President, Treasurer and General Manager, and E. F. Wildermuth is now Secretary and Sales Manager of said company, and are two of the officers for whose retirement said company desires to provide pension funds, now therefore be it

"Resolved, that the proper officers of said company be and they are hereby authorized and empowered to purchase from The Prudential Insurance Company of America Premium Refund Annuity Contracts calling for an annual purchase premium of $5,000.00 per annum

for Daniel D. Hubbell, and an annual purchase premium of $3,000.00 per annum for E. F. Wildermuth; and the Treasurer is authorized and directed to pay to said Insurance Company such annual premiums; and ordered further that said Contracts of Insurance so procured from said Insurance Company be made payable to The Ohio National Bank of Columbus, Ohio, as Trustee in accordance with the terms of a Trust Agreement to be entered into between the Corporation and said bank."

[2] "Death Benefit.—Immediately upon receipt of due proof of the death of the Annuitant before the first monthly instalment of any Annuity hereunder has become due, while this Policy is in force, and upon legal surrender of this Policy at the Home Office of the Company, the Company shall pay either the sum of all the premiums actually paid under this Policy which fell due prior to such death, less any existing indebtedness on account of this Policy, or the net Cash Surrender Value of this Policy at the time of such

Both policies were thus endorsed:

"The White Haines Optical Company may not withdraw this policy or be the death beneficiary or be entitled to receive any refunder of premiums.

"Elias F. Wildermuth [or Daniel D. Hubbell] may not withdraw any cash surrender value while in the employ of The White Haines Optical Company. Henry S. Ballard is the attorney to consult if legal counsel is advisable."

Pursuant to the resolution of December 4, 1936, two separate trust agreements were executed on December 23, 1936, by and between the optical company as settlor and the Ohio National Bank of Columbus as

death, whichever is the greater; or, if a Life Annuity (A) as herein provided has not been elected and the Annuitant lives to receive one or more monthly instalments of Annuity hereunder, but dies before the one hundred and twenty monthly instalments certain have been paid the instalments certain remaining unpaid discounted at three and one-quarter per cent. per annum compound interest shall, upon receipt of due proof of the death of the Annuitant be paid in one sum; such payment shall be made to The Ohio National Bank, of Columbus, Ohio, Trustee under Trust Agreement Dated December 23, 1936.

"If there is no Beneficiary living at the death of the Annuitant to receive the Death Benefit herein provided, such Death Benefit shall be paid to the executors, administrators or assigns of the Annuitant, unless otherwise provided in this Policy. The right to change the Beneficiary has—been reserved.

\* \* \* \* \* \*

"Non-Forfeiture Provisions.

"Paid-up Annuity.—If this Policy, after being in force one full year, shall lapse or become forfeited for non-payment of any premium on the date when due, as specified herein, and if it is not surrendered for its Cash Surrender Value, the Company will put in force in lieu of this Policy, *without any action on the part of the Annuitant*, a Paid-up Annuity Policy which shall provide for an Annuity payable in equal monthly instalments in the same manner as the Annuity under this Policy, commencing on the same date in the same year as provided for the first monthly instalment of the Annuity under this Policy and terminating with the last periodical installment before the death of the Annuitant, except as hereinafter provided. The amount of each such monthly instalment under said Paid-up Annuity Policy shall bear the same proportion to the amount of the monthly instalment of the Annuity under this Policy as the net Cash Surrender Value of this Policy at the time of such lapse or forfeiture, increased by any *dividends standing to the* credit of the Policy, with interest at the rate of three and one-quarter per cent., compounded annually, to the due

date of the first monthly instalment of the Annuity hereunder, bears to the tabular Cash Surrender Value of this Policy at the end of the last policy year preceding the commencement of annuity payments. \* \* \*

"Cash Surrender Value.—If this Policy is continued in force by the due payment of premiums for at least one year, the Annuitant, by written application and return of the Policy to the Home Office of the Company at any time but not after three months from the due date of any premium in default, may elect, subject to the consent of any irrevocable beneficiary, to surrender this Policy for its net Cash Surrender Value. \* \* \*

\* \* \* \* \* \*

"Provisions for Annuity Payments
Prior to Maturity.

"At any time prior to the due date of the first monthly instalment of Annuity provided on the first page hereof, if all due premiums have been paid, the Annuitant may, subject to the consent of any irrevocably designated Beneficiary, elect in writing to receive *in lieu of all other benefits under this Policy*:

"(A) A Life Annuity, payable in equal monthly instalments in every year during the lifetime of the Annuitant, commencing on the date to which premiums have been paid under this Policy and terminating with the last monthly instalment due before the death of the Annuitant, the amount of the monthly instalment payable to be determined upon the basis of the attained age of the Annuitant at the commencement of such monthly instalments in accordance with Table A below; or

"(B) An Annuity payable in equal monthly instalments in every year during the lifetime of the Annuitant, commencing on the date to which premiums have been paid under this Policy and terminating with the last monthly instalment due before the death of the Annuitant, except that if the Annuitant dies before receiving one hundred and twenty monthly instalments certain, the discounted value of the unpaid instalments certain shall be paid in accordance with the provision of this Policy headed 'Death Benefit,' contained on the first page hereof, the amount of the monthly

trustee, in which the petitioners were the respective beneficiaries. The agreements were executed in behalf of the optical company by Hubbell as president, with Wildermuth as secretary. The agreements, which were identical except for the name of the beneficiary and the amount of annual premium, recited that the optical company desired to provide a pension fund for each beneficiary and to that end had purchased an annuity contract for each beneficiary maturing when the beneficiary reached the age of 70 years. Under the agreements, the optical company transferred all right, title, and interest in the annuity contracts to the trustee. The trustee agreed to hold the contracts and use its best efforts to collect all sums payable thereunder. The trustee was not required to present a claim to the insurance company until notified in writing by the optical company or the trust beneficiary and was not required to take legal steps to collect any claims until indemnified. If the contracts matured during the lives of the beneficiaries, the trustee was to receive the monthly payments from the insurance company and remit such amounts, less its commission, to the beneficiaries within five days of receipt of such payments. In the event of the death of a beneficiary, the trustee was to remit any payments under the contracts to such persons as the beneficiary had designated in his lifetime. The trustee was not required to pay any premiums to keep the contracts in force and it was particularly charged not to permit the beneficiaries to withdraw any of the cash value of the contracts while such beneficiary was employed by the optical company. It was further provided that the optical company was not to be a beneficiary of any payment under the contracts nor was it entitled to receive any payments by way of a refunder of premiums. If the company should discontinue the payment of premiums, the annuity contracts were to be held in the reduced proportions provided therein and the trusts were to continue to operate in the same manner as if the optical company had continued such premium payments.

On December 13, 1938, the board of directors of the optical company adopted a resolution authorizing the treasurer to discontinue payments on the annuity contracts for the benefit of petitioners and in lieu thereof a $2500 bonus was paid to Hubbell, and a $1500 bonus was paid to Wildermuth. On December 18, 1939, the optical company adopted a resolution authorizing payment of a bonus to Hubbell in the amount of $5,000 and to Wildermuth in the amount of $3,000. During each of the years 1938 and 1939, the optical company did not pay the premiums specified in the two annuity contracts. During the years 1936 to 1941, inclusive, Hubbell and Wildermuth received annual salaries of $20,000 and $12,000, respectively, exclusive of bonuses.

On December 5, 1940, the board of directors adopted a resolution to the effect that the annuity contracts should be reinstated and the current payments paid. It was decided that the insurance company be asked to make a loan upon the annuity contracts in the aggregate amount sufficient to pay the lapsed premiums thereon. The insurance company refused to make the loans as desired by the optical company and thereafter, during the year 1941, the optical company paid the insurance company the back premiums and the current premiums in the aggregate sum of approximately $25,-000.

On August 14, 1941, a supplemental trust agreement was entered into between the optical company and The Ohio National Bank of Columbus, as trustee in connection with the Hubbell trust. This agreement recited that by reason of an error on the part of the insurance broker the application for the Hubbell annuity contract had been filed on a personal rather than on a corporate application form; and that, as a result of the error, the annuity contract appeared to have been owned by Hubbell prior to its assignment to the trustee, when in fact the optical company owned the contract prior to the assignment. The agreement further recited that to correct the error, Hubbell, on July 8, 1941, had assigned the contract to the optical company, which, in turn, on the same date, had assigned the contract to The Ohio National Bank of Columbus, as trustee. The agreement provided that the trustee should hold the annuity contract under the terms of the trust agreement of December 23, 1936. On December 10, 1941, the board of directors adopted a resolution that it had never been the intention of the optical company to allow the annuity con-

---

instalment payable to be determined upon the basis of the attained age of the Annuitant at the commencement of such

monthly instalments in accordance with Table B below."

520

tracts to lapse but that the real intent was merely to defer the payment of premiums on the contracts until the company was in a better cash position.

On February 4, 1942, the optical company decided to discontinue the annual payments on the annuity contracts. Accordingly, the annuity contract on the life of Wildermuth was converted into a paid-up annuity policy providing for an annuity of $2,122.44, payable in equal monthly installments of $176.87, beginning February 4, 1957. This policy contains an endorsement relating to provisions as to ownership of the policy.[3]

On February 7, 1942, the annuity contract on the life of Hubbell was likewise converted into a paid-up annuity policy providing for an annuity of $3,419.40, payable $248.95 monthly, beginning October 7, 1953.

During the taxable year, the optical company employed approximately 350 persons. To the date of the hearing in this proceeding, it had never established employees' trusts for any of its employees, other than petitioners, nor had it ever provided any plan or program for the formation of such employees' trusts.

In the opinion of the tax court, it was stated at the outset that the issue presented is whether the amounts paid during the taxable year by the White-Haines Optical Company, for premiums upon annuity contracts on the lives of the petitioners, constitute taxable income to the petitioners under Section 22(a) of the Internal Revenue Code of 1939; and that determination of that issue turns upon whether the trusts created fall within the purview of Section 165 of the Internal Revenue Code of 1939, 26 U.S.C.A. Int.Rev.Code, § 165.[4] The opinion declared that the amendment of Section 165, contained in the Revenue Act of 1942, has no retroactive effect in these proceedings.

The contention of petitioners that the two trusts comply with the literal requirements of Section 165 before the 1942 amendment, inasmuch as the trusts were created for the exclusive benefit of "some or all" of the optical company's employees, was rejected; as was also the argument that such interpretation would be in accord with the legislative intent as manifested by

[3] "Provisions as to Ownership of the Policy

"All legal incidents of ownership in the Policy, including all rights, benefits and advantages which the printed provisions thereof purport to confer on the Annuitant, except the right of the Annuitant to receive any Annuity payments becoming due during his or her lifetime, shall, anything in the Policy to the contrary notwithstanding but subject to any limitation herein set forth, belong to The White-Haines Optical Co., of Columbus, Ohio, Its Successors or Assigns.

"Without limiting the generality of such incidents of ownership, such incidents shall include the right:

"(a) to change the Beneficiary from time to time; and

"(b) to elect that Annuity payments shall begin prior to the due date of the first monthly instalment of the Annuity provided on the first page of the Policy;

"but the incorporation of this rider in the Policy shall not affect the right to receive any payment after the death of the Annuitant, unless the right to change the Beneficiary is exercised. Any exercise of the right to change the Beneficiary shall be by written request to the Company at its Home Office, and shall become effective when a provision to that effect has been endorsed upon the policy by the Company."

[4] Sec. 165. Employees' Trusts. (Prior to amendment by Sec. 162 of the Revenue Act of 1942.)

"A trust forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of some or all of his employees—

"(1) if contributions are made to the trust by such employer, or employees, or both, for the purpose of distributing to such employees the earnings and principal of the fund accumulated by the trust in accordance with such plan, and

"(2) if under the trust instrument it is impossible, at any time prior to the satisfaction of all liabilities with respect to employees under the trust, for any part of the corpus or income to be (within the taxable year or thereafter) used for, or diverted to, purposes other than for the exclusive benefit of his employees, shall not be taxable under section 161, but the amount actually distributed or made available to any distributee shall be taxable to him in the year in which so distributed or made available to the extent that it exceeds the amounts paid in by him. Such distributees shall for the purpose of the normal tax be allowed as credits against net income such part of the amount so distributed or made available as represents the items of interest specified in section 25(a)."

the fact that the 1942 amendment requires the inclusion of a minimum percentage of employees for a trust to qualify as tax exempt under Section 165.

Two of its previous opinions, relied upon by the petitioners, were distinguished by the tax court, in that, in the case of Raymond J. Moore, 45 B.T.A. 1073, ten employees of a corporation, which had formally adopted a pension plan for its officers and employees under which certain payments were to be made annually to a trustee and administered for their benefit, had been selected as beneficiaries of the plan, only four of them being either officers or directors; and, in the case of Phillips H. Lord, 1 T.C. 286, a pension trust, meticulously observed, had been established for the benefit of all permanent employees of the company. The comment was made that, in both cases cited, there had been definite programs in writing for the benefit of a substantial number of employees; while in the instant cases the only beneficiaries under the plan are the "two officer-stockholders" of the optical company, thereby giving rise to a strong inference that the instant trusts were established, not merely because petitioners were employees, but also because of their stock interest in the optical company. It was pointed out that trusts thus motivated would not fall within the meaning of the statute as created for the exclusive benefit of employees.

The case of Oscar A. Olstad, 32 B.T.A. 670, was pointed to for the legislative history of Section 165, the undoubted purpose of which was considered to be the encouragement of employers to share profits with employees and to provide a measure of security for them, by pensions, after their earning capacity has diminished or terminated. W. F. Parker, 38 B.T.A. 989, 995, was cited to the point. The tax court asserted that, to encourage this laudable purpose, provision had been made that, if a trust qualifies under Section 165, the employer is allowed a deduction on income tax returns to provide for the payment of reasonable pensions to employees; and the employees are allowed to defer payment of taxes on the amount contributed by the employer for their benefit, until the payments are received by them under the pension plan. Both employer and employee being thus benefited, it is necessary, in determining whether a trust qualifies as tax exempt under Section 165, to scrutinize the details of the plan, its method of operation, and the circumstances under which it is actually carried out. It was declared that the pension plan must be bona fide for the exclusive benefit of employees in the provision of retirement benefits; and must not be merely a device to pay employees additional compensation with the tax on the same deferred to a later date, especially when the plan provides retirement benefits to only a few key executives or officers.

The tax court concluded, from its findings of fact, that the trusts set up for the petitioners are not employees' trusts within the meaning and intent of Section 165 of the Internal Revenue Code; and that the amounts paid by the optical company, during the taxable year, for premiums on the annuity contracts represent taxable income to petitioners under Section 22(a) of the Internal Revenue Code.

The court observed that though the optical company had approximately 350 employees in the taxable year, it had never adopted a written program or definite plan under which its employees generally might secure retirement or pension benefits, the only such benefits being provided for the two petitioners, who were stockholders and the principal officers of the company. It was not believed that the Congress ever intended to permit trusts of the present character to qualify as tax exempt under Section 165. The creation of the trusts and the purchase of the annuity contracts were deemed to be a device to provide additional compensation to petitioners, with deferment of the tax on the same, rather than a plan to provide for their future security. The rhetorical question was put: Why, otherwise, did the optical company defer payment of premiums under the annuity policies in subsequent years when cash bonuses were paid to petitioners?

The tax court pointed to its previous decision in Renton K. Brodie, 1 T.C. 275, wherein lump sum payments for annuity contracts, made by a corporation for the benefit of its employees, were found to represent additional compensation and were held taxable to them under the provisions of Section 22(a). The fact that there was no intervention of a trustee in the Brodie case was not deemed to differentiate it in principle from the instant cases.

The tax court thus rationalized: "Under the trust agreements, the duties of the

trustee were purely ministerial. The trustee agreed to hold the policies until they matured as claims. In that event, it agreed, upon written notice by the Optical Co. or the beneficiaries, to present the claims to the insurance company and to use its best efforts in collecting them. However, it was not required to take any legal proceedings for collection of the claims until it was indemnified. In the event of receipt of monthly payments under the policies it agreed to remit those payments, less commissions, to the beneficiaries within five days of such receipt, or in the event of the death of the beneficiaries it agreed to remit death benefits to such persons as the beneficiaries shall have designated in their lifetimes. The only real duty placed upon the trustee was to prevent a trust beneficiary from withdrawing the cash surrender value of the policy while such beneficiary was employed by the Optical Co., but this provision was mere surplusage, since the policies themselves contained the same provision, as well as the further provision that the Optical Co. was not to be a beneficiary in any way under the policies. Under the circumstances, the trustee was merely a conduit for the payment of claims from the insurance company to the trust beneficiaries. The trustee did not have the usual duties of a trustee, such as the management or investment of a fund. It was not required to pay any of the premiums under the policies or to see that the policies were kept in force. Although the record is not clear, the inference to be drawn is that the trustee did not even pay the premiums on the policies, but that such premiums were paid directly to the insurance company by the Optical Co. We think that the trusts were a mere formality, and their only purpose was an attempt to bring the annuity contracts within the provisions of section 165 and thus qualify them as tax-exempt. To liberally construe section 165 under this factual situation would be to countenance and encourage a subterfuge."

The findings of fact of the tax court are supported by substantial evidence. Indeed, the facts are not in dispute; only the inferences therefrom are in controversy. Under the Dobson doctrine (Dobson v. Commissioner of Internal Revenue, 320 U. S. 489, 64 S.Ct. 239, 88 L.Ed. 248), unless the conclusions of law, rationalized by the tax court upon its findings of fact supported by substantial evidence, are unwarranted and evince plain mistake in the interpretation and application of law, this court is constrained to affirm.

Petitioners contend that the annuities in question were employee trusts sanctioned by Section 165 of the Internal Revenue Code effective in the year 1941, for which year the tax was assessed, because they say that the two petitioners were, within the meaning of the section, "some" of the employees of the corporation creating the trusts. They argue that the fact that only two employees, who happened also to be officers, were made beneficiaries did not withdraw the plan from the protection of the section, as evidenced from the legislative history as well as from the language of the statute. Dictionary references and legal bibliography are adduced in support of the interpretation that "some" may be defined as meaning an indefinite or unspecified, but not large, number of persons, or as meaning two or more. Petitioners assert that repeated attempts were made by the Treasury Department to amend the statute, so as to eliminate the word "some" and substitute therefor a large percentage of employees, to avoid the creation of pension trusts for two or a few large stockholders who control the corporation. These attempts failed until the 1942 enactment, when the number of employees required to be included in the pension trusts was increased to seventy percent. Reference is made by the petitioners to Public Papers and Addresses of President Franklin D. Roosevelt (1937), page 238, et seq.; Hearings before Joint Committee on Tax Evasion and Avoidance, 75th Congress, First Session, pp. 32, 306, 308, 291, 292, 294; Report of Joint Committee on Tax Evasion and Avoidance, 75th Congress, First Session, p. 7; Report of Hearings, Revenue Revision of 1942, p. 87; Report No. 2333, 77th Cong., 2nd Session, pp. 50–57.

■ It is true that subsequent legislation may be considered to aid in the interpretation of prior legislation upon the same subject. Great Northern R. Co. v. United States, 315 U.S. 262, 277, 62 S.Ct. 529, 86 L.Ed. 836. Cf. Brewster v. Gage, 280 U.S. 327, 337, 50 S.Ct. 115, 74 L.Ed. 457; Board of County Commissioners, et al. v. Seber, et al., 318 U.S. 705, 714, 63 S.Ct. 920, 87 L.Ed. 1094; Keasbey & Mattison Co. v. Rothensies, 3 Cir., 133 F.2d 894, 898.

■ The statements of Treasury Department officials before the Congressional committees referred to, taken in entirety, do not, however, support the position of

petitioners; but reveal rather a desire on the part of the administrative officials to avoid costly controversy and litigation of the character here involved. The amendment adopted in 1942 presents no apparent change in Congressional purpose, but was expressly designed "to insure that . . . pension . . . plans are operated for the welfare of employees in general, and to prevent the trust device from being used for the benefit of shareholders, officials, or highly paid employees . . .." Rev. Act of 1942 [H.Rep.No. 2333, 77th Cong. 2d Sess., pp. 103, 104; (1942-2 Cum.Bull. 372)].

■ As was said by Mr. Justice Cardozo, in Burnet v. Wells, 289 U.S. 670, 677, 679, 53 S.Ct. 761, 763, 77 L.Ed. 1439, "there has been a progressive endeavor by the Congress and the courts to bring about a correspondence between the legal concept of ownership and the economic realities of enjoyment or fruition." He said further that, to overcome the statute there involved, "the taxpayer must show that, in attributing to him the ownership of the income of the trusts, or something fairly to be dealt with as equivalent to ownership, the lawmakers have done a wholly arbitrary thing, have found equivalence where there was none nor anything approaching it, and laid a burden unrelated to privilege or benefit." A mere trust form cannot control the substance of a transaction for income tax purposes. United States v. Phellis, 257 U.S. 156, 42 S.Ct. 63, 66 L.Ed. 180. Artifice must not be exalted above reality. Gregory v. Helvering, 293 U.S. 465, 470, 55 S.Ct. 266, 79 L.Ed. 596, 97 A.L.R. 1355.

In Commissioner of Internal Revenue v. Smith, 324 U.S. 177, 181, 65 S.Ct. 591, 593, wherein certiorari was granted on a petition which asserted conflict of the decision reviewed [9 Cir., 142 F.2d 818] with the decision of this court in Connolly's Estate v. Commissioner of Internal Revenue, 6 Cir., 135 F.2d 64, 146 A.L.R. 1387, the Supreme Court said: "Section 22(a) of the Revenue Act is broad enough to include in taxable income any economic or financial benefit conferred on the employee as compensation, whatever the form or mode by which it is effected. See Old Colony Trust Co. v. Commissioner, 279 U.S. 716, 729, [49 S.Ct. 499, 504, 73 L.Ed. 918, 927]."

In our judgment, the reasoning of the tax court is supported in principle by the following, among other authorities which might be cited: Commissioner of Internal Revenue v. Bonwit, 2 Cir., 87 F.2d 764, 765; Noel v. Parrott, 4 Cir., 15 F.2d 669, 671; Yuengling v. Commissioner of Internal Revenue, 3 Cir., 69 F.2d 971, 972; Oberwinder v. Commissioner of Internal Revenue, 8 Cir., 147 F.2d 255; Canaday v. Guitteau, 6 Cir., 86 F.2d 303.

■ We are not impressed with the argument of petitioners that, even if it be conceded that the annuities in question do not constitute a pension trust under Section 165 of the Revenue Act, there was no income received, receivable, or realizable therefrom by the petitioners in the taxable year in issue. The tax court found that the creation of the trust and the purchase of the annuity contracts by the optical company was a device to provide additional compensation to the petitioners and defer the tax on such compensation, rather than a plan to provide for their future security. There was no prohibition in the trust agreement against assignment of the annuity contracts, or the benefits thereunder; nor was there any provision against the taxpayers' obtaining the cash surrender value of the policies *upon leaving the employ of the optical company at any time.* Payment of specified cash surrender values was provided for in the policies. The duties of the trustee were merely ministerial. As well reasoned by the tax court, the only actual duty devolving upon the trustee was to prevent a trust beneficiary from withdrawing the cash surrender value of the policy *while in the employ of the optical company.* The trustee was truly a mere conduit. In the circumstances, the payment by the company of the premiums on the annuity contracts was, as found by the tax court, the equivalent of the payment of the same amount in cash to petitioners. The payments are, therefore, properly taxable to petitioners during the taxable year in which the payments were made.

The decision of the tax court in each of these two cases is affirmed.