**RAMIREZ, LEAL & CO.,**
**Plaintiff-Appellant,**

v.

**CITY DEMONSTRATION AGENCY et al., Defendants-Appellees.**

No. 75–1024.

United States Court of Appeals,
Ninth Circuit.

Oct. 1, 1976.

As Amended on Denial of Rehearing
Feb. 24, 1977.

John W. Keker (argued), of Kipperman, Shawn & Keker, San Francisco, Cal., for plaintiff-appellant.

Judith Teichman, Deputy City Atty. (argued), San Francisco, Cal., for defendants-appellees.

Before DUNIWAY and GOODWIN, Circuit Judges, and CURTIS,* District Judge.

DUNIWAY, Circuit Judge:

The appellant Ramirez, Leal & Co. (Ramirez), a small accounting firm located in the Mission Model Cities area of San Francisco, brought this action to enforce the preference provisions of the Housing and Urban Development Act, 12 U.S.C. § 1701u, and to thus compel the acceptance of its bid to perform the annual audit for the Mission Model Cities' operating agencies, or for appropriate relief based upon the theory that rejection of its bids was unlawful. This is an appeal from an order of the district court of dismissal and for summary judgment in favor of the appellees. We reverse and remand.

* The Honorable Jesse W. Curtis, United States District Judge for the Central District of California, sitting by designation.

## I. *The Facts.*

Richard E. Koeritz is the Director of Administration of the City Demonstration Agency of San Francisco (see 42 U.S.C. § 3312(2)) and was the person ultimately responsible for awarding contracts for the San Francisco Mission Model Cities program. In October of 1973, Koeritz invited a number of accounting firms to bid on the job of auditing the books of the various programs involved in and funded by the Mission Model Cities project. John A. Ramirez's firm, one of the few "Chicano" oriented public accounting firms in the nation, was the only invitee whose business was located in the Model Cities area. Ramirez's firm bid $30,000, and the bid was received on October 26, 1973, four days before the deadline of October 30.

Koeritz noticed in reviewing the bid that Ramirez had failed to consider two small agencies that were to be audited. Koeritz contacted Ramirez directly, as well as through a third party, to inform him of the oversight. During this conversation, Koeritz also told Ramirez that he thought the bid was too low in light of past experience and urged Ramirez to reconsider the bid. Later, and after the deadline of October 30, Ramirez submitted a revised bid of $40,000, although the cost for auditing the two previously omitted agencies was estimated at $2,600. Thus, had the two agencies been included in it, Ramirez's original bid would presumably have been $32,600. The revised bid was not rejected by Koeritz because it was received late, but for another reason.

On November 20, 1973, Koeritz awarded the auditing contract to Haskins & Sells, a large national accounting firm with no office in the target area. Haskins & Sells' bid was $30,000, and Koeritz states in his affidavit that Haskins & Sells was awarded the contract on the basis of its being the low bidder. Apparently, even though Koeritz told Ramirez that $30,000 was too low and thereby induced him to increase his bid, Koeritz did not express the same opinion to Haskins & Sells, who had also bid $30,000. Koeritz also did not allow Ramirez to "match" Haskins & Sells' bid, an opportunity which Ramirez says in his affidavit that he would have acted upon if permitted to.

Because he was not awarded the contract as he expected, Ramirez appealed the awarding of the contract to the Department of Housing and Urban Development (HUD), and upon hearing nothing from HUD Ramirez filed this action on December 19, 1973. While the action was still pending, bids for the 1974 audit were called for. Ramirez's firm bid $35,000; Haskins & Sells bid $25,000. Upon hearing this, Ramirez contacted Koeritz and told him that he would lower the Ramirez bid to $25,000 in order to "match" Haskins & Sells' bid. Joseph Gavin, the City Purchasing Agent, replied that Ramirez's offer would not be accepted because it was made after the deadline for submitting bids. This rejection on the ground of tardiness came despite the fact that the letter soliciting bids termed the contract a "negotiated" contract, and despite the fact that the year before Ramirez's higher bid was not rejected because it was received after the deadline. Ramirez then amended his complaint to include both years in which he claims that he should have been awarded the auditing contract. The district court granted the City Agency's motion to dismiss and, alternatively, for summary judgment, and it denied Ramirez's motion for summary judgment.

Ramirez's claim is based on 12 U.S.C. § 1701u, which was enacted in 1968 as Sec. 3 of the Housing and Urban Development Act of 1968, Pub.L. 90–448, 82 Stat. 476, and was amended by the Housing and Urban Development Act of 1969, Pub.L. 91–152, Title IV, Sec. 404, 83 Stat. 395.

During the time relevant for purposes of this case, the section provided:

## EMPLOYMENT OPPORTUNITIES FOR LOWER INCOME PERSONS IN CONNECTION WITH ASSISTED PROJECTS

Sec. 3. In the administration by the Secretary of Housing and Urban Development of programs providing direct financial assistance in aid of housing, ur-

ban planning, development, redevelopment, or renewal, public or community facilities, and new community development, the Secretary shall—

\* \* \* \* \* \*

(2) require, in consultation with the Administrator of the Small Business Administration, that to the greatest extent feasible contracts for work to be performed in connection with any such project be awarded to business concerns, including but not limited to individuals or firms doing business in the field of planning, consulting, design, architecture, building construction, rehabilitation, maintenance, or repair, which are located in or owned in substantial part by persons residing in the area of such project.

The appeal presents five questions:

1. Does section 1701u cover contracts for work on a Model Cities project initiated under 42 U.S.C. §§ 3301 *et seq.?*

2. Does a HUD guideline in its Standard Grant Agreement have the force of law when it also requires that "local" business be given contract preference?

3. Did the City Demonstration Agency attempt to award the contract to Ramirez, as the only "local" business, "to the greatest extent feasible"?

4. Whether professional accounting service is one of the types of businesses envisioned under § 1701u for local preferential treatment?

5. Whether the Agency complied with § 1701u?

1. The section, as adopted in 1968, reads in pertinent part (Pub.L. 90–448, 82 Stat. 476):
Sec. 3 In the administration of the programs authorized by sections 235 and 236 of the National Housing Act, the below-market interest rate program under section 221(d)(3) of such Act, the low-rent public housing program under the United States Housing Act of 1937, and the rent supplement program under section 101 of the Housing and Urban Development Act of 1965, the Secretary of Housing and Urban Development shall—

\* \* \* \* \* \*

## II. *The Applicability of § 1701u to Model Cities Contracts.*

 It is argued that § 1701u does not apply to projects under the Model Cities Act of 1966 such as the one involved here on the ground that the express language of the statute indicates that the preference provisions are applicable only to housing and urban renewal projects, the statute is silent as to whether its provisions should be extended to non-housing programs, and the legislative history of the statute fails to reveal any congressional intent to require such an extension. But the express language of the statute does not limit itself as claimed, and the legislative history of the 1969 amendments does indicate an intent to bring Model Cities programs and contracts under § 1701u.

### A. *The 1969 Amendment on its Face Applies to Model Cities Contracts.*

As originally passed in 1968, § 1701u only granted preference to "local" businesses under four specifically enumerated housing programs; Model Cities was not one of these four.[1] Just one year later, however, this limitation was abolished and broad language was substituted for it, as quoted above.

The contrast between this language and that of the original section is striking. Instead of being limited to programs carried out under the four named statutes, it was broadened to apply to programs administered by the Secretary of HUD and "providing direct financial assistance in aid of housing, urban planning, development, redevelopment, or renewal, public or community facilities, and new community develop-

(2) require, in consultation with the Administrator of the Small Business Administration, that to the greatest extent feasible contracts for work to be performed pursuant to such programs shall, where appropriate, be awarded to business concerns, including but not limited to individuals or firms doing business in the fields of design, architecture, building construction, rehabilitation, maintenance, or repair, located in or owned in substantial part by persons residing in the area of such housing.

ment." On its face, this language seems to embrace Model Cities types of programs.

Such programs are administered by the Secretary of HUD. Model Cities Programs were first provided for in the Demonstration Cities and Metropolitan Development Act of 1966, Pub.L. 89–754, 80 Stat. 1255. Title I, entitled "COMPREHENSIVE CITY DEMONSTRATION PROGRAMS," is the basic Model Cities Program statute, codified as Title 42, Chapter 41, Subchapter I, §§ 3301ff. of the United States Code. Section 102 (42 U.S.C. § 3302) puts the Secretary of HUD in charge, and the whole act is shot through with statements of the Secretary's authority and responsibility.

Moreover, the broad language of the amended § 1701u (Sec. 3 of Pub.L. 90–448 as amended by Sec. 404 of Pub.L. 91–152) can readily be read to embrace the Model Cities programs. Section 101 of Title I of Pub.L. 89–754 (42 U.S.C. § 3301), the Congressional declaration of policy in the Model Cities Act, speaks of problems of urban life and "unmet needs for additional housing and community facilities and services," of the need for "Federal assistance in addition to that now authorized by the urban renewal program," and of enabling cities "to plan, develop, and conduct programs to improve their physical environment, increase their supply of . . . housing . . . and provide educational and social services vital to health and welfare." It continues:

> The purposes of this title are to provide additional financial and technical assistance to enable cities . . . to plan, develop, and carry out locally prepared and scheduled comprehensive city demonstration programs containing new and imaginative proposals to rebuild or revitalize large slum and blighted areas; to expand housing, job, and income opportu-

nities; to reduce dependence on welfare payments; to improve educational facilities and programs; to combat disease and ill health; to reduce the incidence of crime and delinquency; to enhance recreational and cultural opportunities; to establish better access between homes and jobs; and generally to improve living conditions for the people who live in such areas.

80 Stat. 1255.

Surely these activities fall within the broad phrases quoted, *supra*, of Pub.L. 91–152, § 404 (amended § 1701u).

In addition, an examination of the three statutes with which we are most concerned here, the Demonstration Cities and Metropolitan Development Act of 1966 (Pub.L. 89–754—Model Cities), the Housing and Urban Development Act of 1968 (Pub.L. 90–448, the source of § 1701u), and the Housing and Urban Development Act of 1969 (Pub.L. 91–152, the statute which broadened § 1701u), shows that by 1969 the Congress considered these Acts and a number of others that relate to the problems of the cities as *in pari materia* —as one legislative "ball of wax," so to speak.

Each Act is a package, containing a number of separate titles, dealing with various problems of the cities. Most, but by no means all, relate to housing. Moreover, each Act amends a number of previous acts that deal with these problems, as well as adding new law embodying new approaches to various city problems. Thus, the Act of 1966 contains, in addition to Title I, (Model Cities) Section 113 of which amends the Housing Act of 1949 (80 Stat. 1260), Titles II through X. These deal with almost all problems of urban living, and they amend many other acts. The same can be said of the Acts of 1968 and 1969.[2] In the 1969 Act

---

**2.** The Titles of the Act of 1966, other than Title I, and the acts that they amend are: II, "Planned Metropolitan Development;" III, "FHA Insurance Operations," amending the National Housing Act; IV, "Land Development and New Communities," amending the National Housing Act, the Housing Act of 1954, and the Housing Amendments of 1955; V, "Mortgage Insurance for Group Practice Facilities,"

amending the National Housing Act, § 5136 of the Revised Statutes, the Federal Reserve Act, the Trust Indenture Act of 1939, and Chapter X of the Bankruptcy Act; VI, "Preservation of Historic Structures," amending the Housing Act of 1949, the Housing Act of 1954, and the Housing Act of 1961; VII, "Urban Renewal," amending the Housing Act of 1949; VIII, "Rural Housing," amending the Housing Act of

itself there is evidence of an intent to extend the requirements of 12 U.S.C. § 1701u to Model Cities Act contracts.

This view is strengthened by what seems to be one of the purposes of § 1701u. Model Cities programs, like most HUD assisted programs, are in and relate to low-income or underprivileged areas, and their purpose is generally to upgrade the quality of life in the target areas. The program will have greater beneficial effect if the money spent on the program goes to persons and firms in the area, and is recycled in the area, and so boosts the local economy. The 1969 amendment was a statement by the Congress that it wanted the benefits of employing local persons and firms extended to *all* HUD assisted projects in local neighborhoods rather than to just the four programs enumerated in § 1701u before it was amended in 1969.

A narrow reading of the list of types of programs listed in amended § 1701u might support a contrary conclusion. Such Model Cities agencies as family planning, job counseling, etc., might technically not be programs in aid of "housing," "urban planning, development, redevelopment, or renewal," "public or community facilities," or "new community development," narrowly construed. However, it is not accurate to say that the express language of the statute limits its application to "housing and urban renewal projects." The words "housing" and "urban . . . renewal" appear in the statute, but there are also the words "urban planning, development, and redevelopment," "public or community facilities," and "new community development." Sure-

ly, all of this language is there for a purpose. It is hard to believe that in amending § 1701u Congress wanted local persons and firms employed on HUD assisted programs only when the money was to go for bricks and mortar and for employment on brick and mortar jobs, but not when the money was to go for other vital activities and services.

### B. The Legislative History Supports Application of § 1701u to Model Cities Contracts.

As has been shown, the Housing and Urban Development Act of 1969, which amended § 1701u, was an omnibus act which amended specific sections in a whole range of prior acts. Senate Report No. 91-392 of the Banking and Currency Committee, which reported the amendments out, gives indications of an intention to include under § 1701u all federally funded HUD programs in poor neighborhoods. 1969-2 U.S.Code & Cong.Admin.News 1524, 91st Cong., 1st Sess. In the introduction to the Report, the committee notes:

> The committee bill reported herewith is essentially a bill to extend and continue existing Federal housing programs authorized by previous acts of Congress.
>
> *Id.* at 1524.

The use of the word "housing" might tend to support a narrow interpretation, but in the next paragraph the committee continues:

> In general, the committee agreed to a 2-year extension of those programs that came before the committee for considera-

---

1949; IX, "Urban Information and Technical Assistance Services;" and Title X, "Miscellaneous," amending many statutes. Each Title also adds new law of its own, and as the Titles suggest, that law is by no means restricted to housing and urban renewal.

Much the same can be said of the 1968 Act, Pub.L. 90-448, and its seventeen titles. That Act amends many others, including the 1966 Act (see Pub.L. 90-448, § 602, 82 Stat. 602-03). The same observations are also applicable to the 1969 Act, Pub.L. 91-152 and its four titles. Title III, 83 Stat. 391, entitled "Model Cities and Metropolitan Demonstration Programs," amends the 1966 Act, see Sec. 301, 83 Stat.

391, and Sec. 308, 83 Stat. 394. It is Title IV, "Miscellaneous," which, in Sec. 404, 83 Stat. 395, amends § 3 of the 1968 Act, 12 U.S.C. § 1701u, in the manner set out in the text. It is significant that the amending § 401 is preceded by the following heading: "Employment Opportunities for Lower Income Persons in Connection with *HUD-Assisted Projects*" (emphasis added). It can hardly be said that when the Congress enacted the 1969 Act and particularly § 404, it did not have in mind, as "HUD-Assisted Projects," the Model Cities programs which are expressly mentioned, and the life of which is extended, in Title III of the same Act.

tion. The most important of these are the Federal Housing Administration programs, urban renewal, *model cities*, rent supplement, and public housing.

(emphasis added)

In addition to extending the programs, a number of amendments were agreed to in order to make the programs more workable and more effective in carrying out the intent of Congress . . . .

The use of the single word "housing" in the first paragraph does not limit what is said thereafter.

Later, at p. 1553, the committee notes, in discussing § 1701u:

This extension would greatly broaden the scope of employment and business opportunity for lower income persons and aspiring minority entrepreneurs.

That Ramirez falls into the category of aspiring minority entrepreneur can hardly be doubted. The Model Cities program being one of the "most important" that the committee was then considering, it seems clear that the 1969 amendment to § 1701u was intended to bring Model Cities programs under its coverage.

#### C. *HUD has Interpreted § 1701u as Including Model Cities Contracts.*

At the very least, one must say that whether § 1701u now includes Model Cities is a close question. In such a case, the law requires that courts defer to the interpretation given the statute by the relevant government agency. *Udall v. Tallman*, 1965, 380 U.S. 1, 85 S.Ct. 792, 14 L.Ed.2d 283. In this case, HUD is the relevant agency. HUD agrees with Ramirez that § 1701u includes Model Cities projects. In 24 C.F.R. § 135.15(a)(2) it defines the area covered by § 1701u as that "[w]ithin a geographic area designated as Model Cities areas or . . . ." This regulation has been uniformly included, as it was in this case, in the Standard Grant Agreement with various local agencies. Finally, in this case the Assistant United States Attorney representing HUD stipulated on the record that:

It is and has been the position of the Federal defendants that the provisions of Section 3 of the Housing and Urban Development Act of 1968, 12 U.S.C. § 1701u, apply to Model Cities Programs, such as involved herein.

[R. 1003–04]

We should give deference to HUD's interpretation of § 1701u which does read it as applying to Model Cities programs.

### III. *The Standard Grant Agreement has Legal Force.*

Because § 1701u does include programs under the Model Cities Act, it is not necessary to find that the provision in HUD's agreement with San Francisco requiring local business preference in the Mission Model Cities area is also binding. However, the agreement strengthens the view that § 1701u applies. Appendix 7 to the contract provides:

LABOR STANDARDS PROVISIONS.

1. OPPORTUNITIES FOR RESIDENTS.

In all work made possible or resulting from this Contract, affirmative action will be taken to ensure that . . . business concerns located in or owned in substantial part by residents of the model neighborhood are to the greatest extent feasible, awarded contracts.

█ *Thorpe v. Housing Authority*, 1969, 393 U.S. 268, 274–81, 89 S.Ct. 518, 21 L.Ed.2d 474, supports Ramirez's contention that the Standard Grant Agreement is binding on the city. Neither the fact (1) that the clause requiring local business preference is in the appendix to the agreement, not in the main body, nor (2) that the obligation appears to be merely a contractual one between HUD and San Francisco which Ramirez may not enforce supports a conclusion that *Thorpe* does not apply. There is no support in law for the notion that requirements in an appendix to a contract are void simply because it is called an appendix. The appendix was clearly "in-

corporated by reference" into the contract. The theory that Ramirez has no standing to assert the contractual obligation is wrong because he is an intended beneficiary (i. e., an aspiring minority entrepreneur) of the agreement. Thus, Ramirez has standing as a third party beneficiary. *See Brown v. Housing Authority of Milwaukee,* 7 Cir., 1972, 471 F.2d 63, 69. *Thorpe* controls and makes the Standard Grant Agreement requirement binding on the city.

## IV. *Section 1701u Does Cover the Contracts for Accounting Services Involved Here.*

The auditing contract is not one of the principal contracts aimed at carrying out a Model Cities program. Moreover, it does not fit neatly into the terminology of the first paragraph of § 1701u: "Programs providing direct financial assistance . . . in aid of housing, urban planning, development, redevelopment, or renewal, public or community facilities, and new community development," or that of subsection (2): "contracts for work to be performed in connection with any such project [projects mentioned in the opening paragraph] be awarded to business concerns, including but not limited to individuals or firms doing business in the field of planning, consulting, design, architecture, building construction, rehabilitation, maintenance, or repair . . . ."

■ Nevertheless, the section does apply to the auditing contracts here involved. Those contracts are paid for in part by "direct financial assistance" from HUD (§ 1701u, first paragraph) and they are "in aid of" (ibid.) the objectives listed in § 1701u because they facilitate and protect the grants and the carrying out of Model Cities contracts. Moreover, subsection (2) contains the phrase "including but not limited to," one that is often used to mitigate the sometimes unfortunate results of rigid application of the *ejusdem generis* rule. It appears that Congress did not wish to exclude from the requirements of § 1701u contracts such as those here involved.

## V. *It was error to grant, as an alternative, a summary judgment for defendants on the merits.*

In its "Decision and Order," the trial court first concluded that "neither 42 U.S.C. 3301 *et seq.,* 12 U.S.C. 1701(u), nor the CDA letters require the City to contract 'to the greatest extent feasible' with the business concerns located in the neighborhood area. The City *is* contractually required by the Grant Agreement to ensure such preferential treatment in contract awards, but plaintiff lacks standing to enforce this Grant Agreement." The court then stated:

For the purpose of considering the cross motions for summary judgment the Court will assume *arguendo* that (1) 42 U.S.C. 3301 *et seq.*; 12 U.S.C. 1701(u), the HUD Circulars and the Grant Agreement all legally obligate the City to give preferential treatment to plaintiff and (2) that plaintiff has standing to sue as a third party beneficiary. Furthermore, the Court is of the opinion, and therefore finds that the record now before it does not leave any genuine issue of material fact at issue.

(footnote omitted)

The Court then proceeded to review the evidence and conclude that summary judgment should be rendered for defendants. In doing so, however, the court applied a wrong legal standard. It summarized its views as follows:

By way of summary: (1) Plaintiff was never the low bidder as his initial $30,000 bid did not include certain agencies to be audited; (2) City officials correctly considered $40,000 as plaintiff's 'final' bid; (3) Plaintiff's bid exceeded Haskins & Sells by $10,000 or approximately 33%; (4) The San Francisco Model Cities Program was in serious financial trouble; (5) City officials knew of a general requirement that contracts be awarded "to the greatest extent feasible" to neighborhood business concerns.

This Court can neither make a finding of fact nor a conclusion of law that it was feasible to award the audit contract to plaintiff's accounting firm. The flexible

language "to the greatest extent feasible" gives broad discretion to the officials charged with the responsibility of awarding contracts. Unless the facts clearly show these officials failed to apply a required standard or were clearly erroneous in determining feasibility, courts are prohibited from disturbing their decisions.

\* \* \* \* \* \*

There is no question concerning plaintiff's competence to perform the audit and there is little dispute that an award to the plaintiffs [sic] would advance the policies set forth in 12 U.S.C. 1710(u), 42 U.S.C. 3303(a), Circular # 8 and the Grant Agreement.

\* \* \* \* \* \*

While, as plaintiff's counsel argues, defendants were not legally bound to request proposals from other accountants and could have negotiated an audit agreement directly with plaintiff they chose not to do so. There appears to be a rational basis for the approach they took. The fact that Ramirez was invited to submit a proposal shows that he was not being ignored or excluded. The fact that defendants were willing to give him a 5% advantage in the bidding process shows due concern to give a preference to employees [sic] in the Model Cities Area. However, when Mr. Ramirez's bid exceeded the Haskins & Sells bid by 80% it was clearly not feasible to make the award to Ramirez.

Finally, the Court finds the defendants' reasons for not allowing Ramirez to meet Haskins & Sells' low bid to be most persuasive.

(footnotes omitted)

The statute, contrary to the views of the trial court, does require award of the contract in issue, "to the greatest extent feasible," to Ramirez. This language clearly requires more than the trial court seems to think that it does. It is not enough that Ramirez was given a chance to bid, or that defendants "chose" not to negotiate with him. It is not enough that there appears to be a rational basis for what the defendants did. They were required, to the "greatest extent feasible," to contract with Ramirez. This is strong language. It does not give the City officials the "broad discretion" that the trial court concluded that it does. We think that "greatest extent" means what it says, the maximum, and that the defendants were therefore obliged to take every affirmative action that they could properly take to make the award to Ramirez. Most of the evidence strongly points to a conclusion that they did not do so, and that what they did do had the effect, whether intentionally or not, of preventing Ramirez from getting the contract. The affidavits and testimony of Koeritz and others make it clear that they, as the responsible officials involved, shared the trial court's views about their duties. They just did not believe that "greatest extent feasible" means what it says. At the very least, there is conflict in the evidence on the question. It follows that it was error to grant a summary judgment for the defendants.

The petition for a rehearing is denied.

The judgment is reversed and the case is remanded to the district court for further proceedings consistent with this opinion.