694 F.2d 1162
 30 Cont.Cas.Fed. (CCH) 70,631
 ALASKA CHAPTER, ASSOCIATED GENERAL CONTRACTORS OF AMERICA,
INCORPORATED, Tate and Company Contractors, and
R.A. Vranckaert Company, Plaintiff-Appellants,
v.
Samuel PIERCE, as Secretary of the Department of Housing and
Urban Development, The United States of America, AVCP
Housing Authority, Nana Regional Housing Authority, and
Kodiak Island Housing Authority, Defendant-Appellees,
and
Association of Village Council Presidents, Inc., J & A,
Inc., and Hooper Bay Construction Company, Nana
Construction Company, Inc., Nichol
Mechanical, and Hoffman Home
Builders,
Intervenor-
Appellees.
 No. 81-3189.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 20, 1981.
Decided Dec. 17, 1982.
 
 Joseph N. Barcott, Gen. Counsel, Anchorage, Alaska, for plaintiffs-appellants.
 Richard Anthony Baenen, James T. Brennan, Hedland, Fleischer & Friedman, Anchorage, Alaska, Richard R. Cole, Fairbanks, Alaska, Irving Gornstein, Washington, D.C., argued for defendants-appellees; Rene J. Gonzalez, U.S. Atty., Anchorage, Alaska, on brief.
 Appeal from the United States District Court for the District of Alaska.
 Before SKOPIL, FLETCHER and FARRIS, Circuit Judges.
 SKOPIL, Circuit Judge:
 
 
 1
 The Alaska Chapter of Associated General Contractors appeals the district court's decision holding that a HUD regulation implementing a preference to Indian-owned economic enterprises for contracts to build housing for Indians does not violate equal protection. We affirm.
 
 I.
 
 2
 The Department of Housing and Urban Development ("HUD"), pursuant to the United States Housing Act of 1937, 42 U.S.C. Secs. 1437-1440, provides financial and other assistance to the construction, development and operation of low-income housing by, among others, Indian Housing Authorities ("IHAs").[1] HUD has financed the construction of low-income housing in remote Alaskan villages through the Alaska IHAs.
 
 
 3
 In 1974, as part of the Indian Self-Determination Act, 25 U.S.C. Secs. 450-458, Congress directed that preferences be given to Indian-owned economic enterprises (IOEEs) in the awarding of federal contracts:
 
 
 4
 Any contract, subcontract, grant, or subgrant pursuant to this ... or any other Act authorizing Federal contracts with or grants to Indian organizations or for the benefit of Indians, shall require that to the greatest extent feasible--
 
 
 5
 * * *
 
 
 6
 * * *
 
 
 7
 (2) preference in the award of sub-contracts and sub-grants in connection with the administration of such contracts or grants shall be given to Indian organizations and to Indian-owned economic enterprises as defined in section 1452 of this title.
 
 
 8
 25 U.S.C. Sec. 450e(b) (Indian Self-Determination Act, Pub.L. No. 93-638, Sec. 7(b), 88 Stat. 2205).
 
 
 9
 To implement the section 7(b) Indian preference, HUD enacted regulations that applied to the construction of housing for Indians by IHAs. The IHA may simply advertise for bids or proposals, with a notice that bids will be accepted only from "qualified Indian organizations and Indian-owned economic enterprises." 24 C.F.R. 805.204(a)(1)(i). A two-stage procedure is also permitted. Under this procedure, the IHA first publishes a prior invitation asking IOEEs to submit a statement of intent to respond to a bid announcement, accompanied by evidence establishing both their qualifications as an IOEE and technical qualifications for the job. 24 C.F.R. 805.204(a)(1)(ii), (a)(3). If responses are received from one or more Indian enterprises who are found to be qualified, the IHA then may advertise for bids or proposals limited to qualified IOEEs. 24 C.F.R. 805.204(a)(1)(ii).[2] If no Indian-owned business submits an acceptable bid, IHAs may advertise for bids from the general public. 24 C.F.R. 805.204(a)(2). The total contract cost per unit is limited to a prototype cost established by HUD. 24 C.F.R. 805.213, .214. The use of this particular method of preference is discretionary with each IHA. 24 C.F.R. 805.204(a)(1).
 
 
 10
 In 1981, the Alaska IHAs began using a bid procedure pursuant to 24 C.F.R. 805.204(a)(1)(ii), and published invitations for IOEEs to submit a statement of intent for the construction of HUD-approved low-income housing projects.
 
 
 11
 On February 27, 1981, appellants Associated General Contractors and two non-Indian-owned construction companies (hereinafter "AGC") filed a complaint for declaratory judgment and injunctive relief against the HUD regulation, 24 C.F.R. 805.204(a), claiming that the regulation constituted unlawful discrimination in violation of the due process clause of the Fifth Amendment. The suit named as defendants the Secretary of HUD, the United States, and three IHAs.
 
 
 12
 Cross-motions for summary judgments were filed by AGC and jointly by HUD and the IHAs. Two Indian-owned construction companies and the Associated Village Council Presidents, Inc., a non-profit corporation representing native interests in its region, intervened as defendants. The Tribal Employment Rights Planning Committee (TERPC) was granted leave to submit a brief as amicus curiae in support of the defendants. The parties then entered into a stipulation of facts.
 
 
 13
 On March 16, 1981, the district court denied appellants' motion for summary judgment, and granted appellees' motion for summary judgment. The district court found that the purpose of the regulation was not related to a political function, that the classification was racial, and did not apply the rational basis standard as in Morton v. Mancari, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). The district court subjected the regulation to strict scrutiny, and held that the preference was constitutional. Judgment was entered on March 17, 1981. AGC appeals.
 
 II.
 
 14
 The following issues are presented for review:
 
 
 15
 (1) Whether the HUD regulation, 24 C.F.R. 805.204(a), which directs IHAs to give a contracting preference to Indian-owned businesses, is authorized by section 7(b) of the Indian Self-Determination Act; and
 
 
 16
 (2) Whether the Indian preference of the HUD regulation violates principles of equal protection embodied in the due process clause.
 
 III.
 
 17
 The arguments that HUD regulation 24 C.F.R. 805.204(a) is not authorized by section 7(b) of the Indian Self-Determination Act were not raised below. Issues not presented to the trial court need not be considered on appeal, Inman Poulsen Lumber Co. v. Internal Revenue Service, 219 F.2d 159, 161-62 (9th Cir.1955), unless injustice might otherwise result, Roberts v. Hollandsworth, 582 F.2d 496, 499-500 (9th Cir.1978), or where the issue involves only questions of law, Telco Leasing, Inc. v. Transwestern Title Co., 630 F.2d 691, 693 (9th Cir.1980). Since these issues involve only questions of law, we will exercise our discretion and consider them.
 
 A.
 
 18
 AGC first argues that Congress intended for the section 7(b) preference to apply only to services and programs under the Indian Self-Determination Act, i.e. those administered by the Bureau of Indian Affairs (BIA), the Indian Health Service (IHS), or those dealing directly with Indian self-government or education, and not to HUD programs.
 
 
 19
 To determine the intent of Congress we look first to the plain meaning of the statute. Hughes Air Corp. v. Public Utilities Commission, 644 F.2d 1334, 1337 (9th Cir.1981). Section 7(b) applies to "any contract, sub-contract ... pursuant to this Act ... or any other Act authorizing federal contracts with or grants to Indian organizations or for the benefit of Indians." 25 U.S.C. Sec. 450e(b) (emphasis added). The contracts in this case are awarded pursuant to the United States Housing Act of 1937, which authorizes the Secretary of HUD to enter into contracts with IHAs for the development of low-cost housing for the benefit of Indians. By its express terms, then, section 7(b) applies to the HUD contracts for building housing for the benefit of Indians.
 
 
 20
 It thus appears plain to us from the language of the statute that Congress intended the section 7(b) preference to apply to these HUD contracts for the construction of housing for the benefit of Indians.[3]B.
 
 
 21
 AGC argues that, even if Congress intended section 7(b) to apply to HUD, the HUD regulation constitutes an exclusive preference beyond the congressional authorization.
 
 
 22
 Section 7(b) provides that an Indian preference in contracts shall be given "to the greatest extent feasible." 25 U.S.C. Sec. 450e(b). Similar language in other statutes has been interpreted to mean the maximum, "to take every affirmative action they could." Ramirez, Leal & Co. v. City Demonstration Agency, 549 F.2d 97, 105 (9th Cir.1976); see also Calvert Cliff's Coordinating Committee v. Atomic Energy Commission, 449 F.2d 1109, 1115 (D.C.Cir.1971).
 
 
 23
 The HUD regulation, according to this interpretation, is within the congressional intent. In fact, HUD could properly have gone further and required that all housing construction contracts be awarded to Indian-owned companies, regardless of qualification. The HUD regulation is thus definitely within the congressional authorization, as it provides for contracts to be awarded to IOEEs only if a qualified one is available. An IOEE must demonstrate that it has "the technical, administrative, and financial capability to perform contract work of the size and type involved and within the time provided under the proposed contract." 24 C.F.R. 805.204(a)(3)(iii). Further, the bid must be within the range of the prototype cost for the project. 24 C.F.R. 805.213, 805.214. If no IOEE exists that is so qualified, then the work can be awarded under the HUD preference to a non-Indian-owned business. 24 C.F.R. 805.204(a)(2). Finally, it is within the discretion of each IHA whether to utilize this particular preference. 24 C.F.R. 805.204(a)(2). Thus the preference is by no means exclusive.
 
 C.
 
 24
 AGC states that "before a governmental agency may establish a preferential classification based on race or ethnic background, three requirements must be satisfied. It must have been given express authority by Congress to take such action, it must have made its own independent findings of past discrimination, and it must determine that its actions are responsive to that discrimination." AGC then argues that the regulation is ultra vires because HUD has not satisfied any of these requirements.
 
 
 25
 Even assuming the above is a correct statement of the law, which we do not, it would not apply to the present situation. All the cases cited by AGC in support of this proposition deal only with situations in which the agency established a preferential classification in the first place, without a congressional mandate. See Central Alabama Paving, Inc. v. James, 499 F.Supp. 629, 636 (M.D.Ala.1980); Pettinaro Construction Co., Inc. v. Delaware Authority For Regional Transit, 500 F.Supp. 559 (Del.1980). In this case, the Indian preference was established and mandated by Congress, not by HUD. The regulation is only the implementation of Congress' directive.
 
 
 26
 We therefore conclude that HUD regulation 24 C.F.R. 805.204(a) is authorized by section 7(b) of the Indian Self-Determination Act.
 
 IV.
 
 27
 In Morton v. Mancari, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), the Supreme Court upheld an exclusive Indian employment preference in the BIA. The Court rejected a traditional equal protection analysis, and applied the rational basis test to the legislation because of the unique legal status of Indian tribes under federal law. This unique status derives from two sources. The first is the special status accorded Indians in the Constitution through the commerce clause and the treaty power clause,[4] and the second is the guardian-ward relationship that arose between the federal government and the Indian tribes because of the tribes' subordinating their inherent sovereignty to that of the United States in exchange for the protection and supervision of the government.[5] Because of the political status of Indians, the Court held that the "preference does not constitute 'racial discrimination' [nor is it] even a 'racial' preference." Id. at 553, 94 S.Ct. at 2484.[6] The Court concluded:
 
 
 28
 As long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians, such legislative judgments will not be disturbed. Here, where the preference is reasonable and rationally designed to further Indian self-government, we cannot say that Congress' classification violates due process.
 
 
 29
 Id. at 555.
 
 
 30
 The district court held that Mancari did not apply to the present situation. It held that Mancari was limited to functions designed to further Indian self-government, and that because the preferred group in this case was not engaged in self-government, the preference was based on a racial classification.
 
 
 31
 The district court's interpretation of Mancari is incorrect. Mancari 's holding is not limited to Indian self-government functions. According to Mancari, the special treatment need only be rationally related to the furtherance of Congress' unique obligation toward the Indians. In holding that the BIA preference was designed to further a legitimate governmental purpose, the court determined that Indian self-government is simply one of the kinds of activities which are tied rationally to Congress' unique obligation.
 
 
 32
 That the Mancari court intended a broad analysis is obvious by analyzing cases cited by it and by subsequent cases applying Mancari. In Board of County Commissioners v. Seber, 318 U.S. 705, 63 S.Ct. 920, 87 L.Ed. 1094 (1943), cited in Mancari, the Court had applied the rational basis test rather than strict scrutiny, to a congressionally-granted property tax immunity for individual Indians, a function unrelated to tribal self-government.[7] In Morton v. Ruiz, 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974), also cited in Mancari, the court upheld the administration of a federal general assistance program for individual needy Indians. This program was totally unrelated to tribal sovereignty or self-government.
 
 
 33
 In subsequent cases, the Supreme Court cited Mancari and applied the rational basis test to the following interests, which are much broader than tribal self-government: right of individual Indian profit-making businesses to be free from state taxation, Moe v. Confederated Salish & Kootenai Tribes, 425 U.S. 463, 479-80, 96 S.Ct. 1634, 1644-1645, 48 L.Ed.2d 96 (1976); right to fish, Washington v. Washington State Commercial Passenger Fishing Vessel Assoc., 443 U.S. 658, 673 n. 20, 99 S.Ct. 3055, 3068 n. 20, 61 L.Ed.2d 823 (1979); imposition of federal rather than state law on Indians committing crimes on reservations, United States v. Antelope, 430 U.S. 641, 645-47 & n. 7, 97 S.Ct. 1395, 1398-1399 & n. 7, 51 L.Ed.2d 701 (1977).
 
 
 34
 In United States v. Antelope, the Court explicitly stated that Mancari applied to functions broader than self-government:
 
 
 35
 "Both Mancari and Fisher [v. District Court, 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976) ] involved preferences or disabilities directly promoting Indian interest in self-government, whereas in the present case we are dealing, not with matters of tribal self-regulation but with federal regulation of criminal conduct with an Indian country implicating Indian interests. But the principles reaffirmed in Mancari and Fisher point more broadly to the conclusion that federal regulation of Indian affairs is not based upon impermissible classifications."
 
 
 36
 Id. 430 U.S. at 646, 97 S.Ct. at 1398.
 
 
 37
 The Ninth Circuit has applied Mancari to Indian interests broader than self-government. This court, upholding against an equal protection challenge regulations exempting Indians from certain fishing restrictions, relied heavily on Mancari and applied the rational basis test, stating: "Traditional equal protection analysis, which requires a compelling state interest to justify invidious racial discrimination, does not apply to legislation or governmental action favoring Indians." United States v. Decker, 600 F.2d 733, 740 (9th Cir.1979).
 
 
 38
 AGC argues that strict scrutiny applies, rather than the rational basis test of Mancari, because the classification is allegedly racial rather than political. AGC argues that the HUD preference is a racial classification because HUD's definition of Indians eligible for preference is not directed to tribal groups but is so broad as to admit anyone who could be considered an Indian on the basis of blood quantum, regardless of tribal or political affiliation.[8] We reject such a limited interpretation of Mancari. Mancari simply held that, as long as the special treatment is rationally related to Congress' unique obligation towards the Indians, the preference would not violate equal protection.[9] If the preference in fact furthers Congress' special obligation, then a fortiori it is a political rather than racial classification, even though racial criteria might be used in defining who is an eligible Indian.[10] This court has already given Mancari such a broad construction. See Decker, 600 F.2d at 740-41.
 
 
 39
 In summary, legislation preferring Indians is constitutional when applying the rational basis test "as long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians." Mancari, 417 U.S. at 555, 94 S.Ct. at 2485; Decker, 600 F.2d at 740-41.
 
 
 40
 Applying this broad mandate, we hold that the challenged HUD regulation, implementing section 7(b) of the Indian Self-Determination Act, is rationally related to the fulfillment of Congress' unique obligation toward Indians and Alaska Natives.[11] One of the purposes of the Indian Self-Determination Act is to develop leadership skills in Indians. 25 U.S.C. Sec. 450(a). Encouraging and assisting Indian-owned businesses helps develop such leadership and furthers the government's trust obligation to help the Indians develop economic self-sufficiency.
 
 
 41
 Congress has clearly expressed its desire to further Indian-owned businesses:
 
 
 42
 One of the most serious problems on the Indian reservations is the inadequate availability of financial resources to permit the Indian people to develop their own resources and potential. All the traditional indicators of economic levels place Indians and Indian reservations at the bottom of the scale. On every reservation today, there is almost a total lack of an economic community. If the long-sought goal of Indian self-sufficiency is to be reached, such financial assistance must be provided or facilitated.
 
 
 43
 * * *
 
 
 44
 * * *
 
 
 45
 Income generated through Federal, tribal, or other kinds of activity on the reservation does not stay on the reservation, pursuant to the classic economic theory of the "multiplier effect," because of this lack of an economic community. With the absence of Indian-owned small businesses on the reservation, this income immediately flows off the reservation enriching the off-reservation, non-Indian communities.
 
 
 46
 H.Rep. No. 93-907, 93d Cong., 2d Sess. 607, reprinted in 1974 U.S.Code Cong. & Ad.News 2873, 2874. The Indian preference policy of section 7(b) and the HUD regulation at issue here directly serves to generate funds necessary to the economic development of Indian communities.
 
 
 47
 In conclusion, because this HUD regulation furthers the government's trust responsibility towards Indians, it does not violate equal protection.[12]
 
 CONCLUSION
 
 48
 The HUD Indian preference regulation is authorized by section 7(b) of the Indian Self-Determination Act. The HUD preference for Indian-owned construction companies furthers the special obligation Congress has towards Indians, and thus the correct scrutiny to apply is the rational basis test. It is clear to us, and appellants concede, that the regulation passes the rational basis test. Therefore the regulation is constitutional.
 
 
 49
 AFFIRMED.
 
 
 
 [1]
 HUD is authorized to provide financial assistance to federally recognized governmental entities known as "public housing agencies". 42 U.S.C. Secs. 1437b, 1437c. "Public housing agency" is defined as "any State, county, municipality or other governmental entity or public body (or agency or instrumentality thereof) which is authorized to engage in or assist in the development or operation of low-income housing." Id. Sec. 1437a(6). The term "State" is defined to include "Indian tribes, band, groups and Nations, including Alaska Indians, Aleuts, and Eskimos." Id. Sec. 1437a(7)
 To take advantage of the Housing Act, the Alaska legislature in 1971 passed a law providing for the establishment of 12 regional native housing authorities. Alaska Stat. Sec. 18.55.995-998 (1981). Native associations in 12 regions of Alaska formed IHAs during the early 1970s pursuant to this statute.
 
 
 [2]
 The HUD regulation provides in pertinent part:
 Indian preference in contracting.
 (a) Preference in the Award of Contracts. (1) An IHA shall to the greatest extent feasible under this Part give preference in the award of contracts in connection with a Project to Indian Organizations and Indian-owned Economic Enterprises. The following method of providing preference may be used with HUD approval:
 (i) Advertise for bids or proposals limited to qualified Indian Organizations and Indian-owned Enterprises, or
 (ii) Use a two-stage procedure: Stage 1. Publish a prior invitation for Indian-owned Economic Enterprises to submit a Statement of Intent to respond to such a limited advertisement when published, and to furnish with the Statement of Intent, or within a specified period of time, evidence sufficient to establish their qualifications as an Indian Organization or an Indian-owned Economic Enterprise in accordance with paragraph (a)(3) of this section. Stage 2. If responses are received from one or more Indian enterprises who are found to be qualified, advertise for bids or proposals limited to qualified Indian Organizations and Indian-owned Economic Enterprises.
 
 
 [24]
 C.F.R. 805.204(a)(1)
 
 
 [3]
 The legislative history concerning section 7(b) simply states that this section was adopted in response to the recommendation of the Department of the Interior. 1974 U.S.Code Cong. & Admin.News 7775, 7777. In the absence of legislative history, the contemporaneous interpretation of the statute by the administering and developing agency is particularly important. Miller v. Youakim, 440 U.S. 125, 144, 99 S.Ct. 957, 968, 59 L.Ed.2d 194 (1979). The regulations of the Department of the Interior, the agency that recommended the inclusion of section 7(b) and that has primary responsibility for Indian matters, state that the Indian preference clause shall be applicable to all BIA contracts and to non-BIA contracts where the work to be performed is specifically for the benefit of Indians or if by an act authorizing contracts with Indian organizations. 41 C.F.R. 14-1.354(b). The Department of the Interior, therefore, has interpreted 7(b) as applying to any division's contracts or grants for the benefit of Indians and not just to programs under the Self-Determination Act
 Statements by the proponents of legislation made after passage of the legislation, though not conclusive, are entitled to some weight in interpreting the statute. Parker v. Califano, 561 F.2d 320, 339 (D.C.Cir.1977). Members of the House Committee on Interior and Insular Affairs, which added section 7(b) to the Self-Determination Act, during oversight hearings on the implementation of section 7(b) by various agencies, clearly expressed their opinion that HUD was to enforce section 7(b). Indian Economic Development Programs: Oversight Hearing on Indian Preference in Federal Contracting Before the Committee on Interior and Insular Affairs, Serial No. 96-7, Part III, 96th Cong., 2d Sess. (May 22, 1980) 10-15.
 
 
 [4]
 "The plenary power of Congress to deal with the special problems of Indians is drawn both explicitly and implicitly from the Constitution itself. Article I, section 8, cl. 3, provides Congress with the power to 'regulate Commerce ... with the Indian Tribes' and thus, to this extent, singles Indians out as a proper subject for separate legislation. Article II, section 2, cl. 2, gives the President the power, by and with the advice and consent of the Senate, to make treaties. This has often been the source of the Government's power to deal with the Indian Tribes."
 Mancari, 417 U.S. at 551-52, 94 S.Ct. at 2483-2484.
 
 
 [5]
 This relationship was first articulated in Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 (1831). See also United States v. Kagama, 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886); Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832)
 
 
 [6]
 The Court then noted that
 "The preference is not directed towards a 'racial' group consisting of 'Indians'; instead it applies only to members of 'federally recognized' tribes. This operates to exclude many individuals who are racially to be classified as 'Indians.' In this sense, the preference is political rather than racial in nature."
 Mancari, 417 U.S. at 553 n. 24, 94 S.Ct. at 2484 n. 24.
 
 
 [7]
 We note that the Mancari court did not discuss nor approve the rationale of Seber, and we decline to do so also. Seber is a "termination" era case and represents an outdated congressional policy
 
 
 [8]
 HUD defines Indians as "any person recognized as being an Indian or Alaskan Native by a tribe, the Government, or any state,". A tribe is defined as "an Indian tribe, band, pueblo, group or community of Indians or Alaskan Natives." 24 C.F.R. 805.102
 AGC states that it is not challenging the constitutionality of section 7(b) or of any congressional statute or definition. AGC concedes that the Congressional definitions of Indian in the Indian Self-Determination Act are permissible, and challenges only HUD regulation 24 C.F.R. 805.102 defining which Indians are subject to the preference.
 
 
 [9]
 See F. Cohen, Handbook of Federal Indian Law, 654-58 (1982)
 
 
 [10]
 We note that the district court expressly refused to decide whether the use of blood quantum in the HUD definition rendered the definition a racial rather than a political preference. The district court avoided this issue by finding on other grounds that the HUD definition was a racial classification. Because we reject the district court's conclusion regarding the HUD definition, we address briefly HUD's use of blood quantum in order to make it clear that reliance on such a factor does not render an otherwise political definition racial
 In Mancari, the preference was based partly on blood quantum. To be eligible for the preference "an individual [had to be] one-fourth or more degree Indian blood and ... a member of a federally-recognized tribe." 417 U.S. at 553 n. 24, 94 S.Ct. at 2484 n. 24 (quoting 44 BIAM 335, 3.1). The Supreme Court did not hesitate to find this definition political. Id. at 555, 94 S.Ct. at 2485.
 The HUD definition in this case is quite similar to the definition considered in Mancari, see note 7 supra, and is clearly a political rather than racial classification. The classification is not based solely on blood quantum, but on recognition by a tribe or governmental entity. The mere presence of Indian blood or other racial characteristics in the definition is not necessarily sufficient to qualify a person or a business entity as Indian or Indian-owned. In Alaska, where the Natives' situation is distinctly different from that of other American Indians, the use of blood quantum as one factor in defining which persons are to be included as Indians and subject to the statutory benefits is helpful in identifying the defined group and does not detract from the political nature of the classification.
 Alaskan Natives, including Eskimos and Aleuts, have been considered to have the same status as other federally recognized American Indians, through the treaty powers of the President and the Senate pursuant to Article II, Section 2, cl. 2 of the Constitution. The 1867 Treaty of Cession with Russia, by which the United States acquired the Territory of Alaska, provides that "[t]he uncivilized tribes will be subject to such laws and regulations as the United States may, from time to time, adopt in regard to the aboriginal tribes of that country." Treaty of March 30, 1867, 15 Stat. 539. It is now established that through this treaty the Alaskan Natives are under the guardianship of the federal government and entitled to the benefits of the special relationship. Alaska Pacific Fisheries v. United States, 248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138 (1918); Pence v. Kleppe, 529 F.2d 135, 138 n. 5 (9th Cir.1976); Alaska v. Annette Island Packing Co., 289 F. 671 (9th Cir.), cert. denied, 263 U.S. 708, 44 S.Ct. 36, 68 L.Ed. 517 (1923).
 Alaskan Natives have not historically been organized into reservations or into tribal units. See Morton v. Ruiz, 415 U.S. at 212, 94 S.Ct. at 1063 (1974). Alaskan Natives, unlike other American Indians, never entered into treaties with the United States designating reservation lands which Natives were entitled to occupy. United States v. Atlantic Richfield Co., 435 F.Supp. 1009, 1015 (D.Alaska 1977), aff'd 612 F.2d 1132 (9th Cir.), cert. denied, 449 U.S. 888, 101 S.Ct. 243, 66 L.Ed.2d 113 (1980). To accommodate the unique situation of Alaskan Natives, Congress has utilized methods other than tribal rolls or proximity to reservations, which have generally been used as eligibility criteria in statutory programs for the benefit of Indians. The Supreme Court has already noted and approved one such different treatment of Alaskan Natives. Morton v. Ruiz, 415 U.S. at 212, 94 S.Ct. at 1063.
 One method was to provide for the forming of native groups which would be eligible for federal statutory benefits. The Indian Reorganization Act (IRA) of 1934, 25 U.S.C. Secs. 461 et seq., was amended in 1936 to provide for the unique non-reservational and non-tribal status of Alaskan Natives, providing:
 [t]hat groups of Indians in Alaska not recognized prior to May 1, 1936, as bands or tribes, but having a common bond or occupation, or association, or a residence within a well-defined neighborhood, community, or rural district, may organize to adopt constitutions and bylaws and to receive charters of incorporation and Federal loans under [the IRA].
 25 U.S.C. 473a. Pursuant to this congressional suggestion, a large number of "IRA village councils" have been organized in Alaska and recognized by the federal government. The Alaska Native Claims Settlement Act ("ANSCA"), 43 U.S.C. Secs. 1601 et seq. (1971), also provided for the establishment of thirteen regional Native corporations, 43 U.S.C. Sec. 1606, and a large number of village corporations which represented the residents of Native villages, 43 U.S.C. Sec. 1607. These entities were then entitled to select and obtain title to certain federal lands, and to share in proceeds of the cash settlement from the federal government.
 A second method Congress has utilized to deal with the unique Alaskan situation has been to make a political definition of which Alaskan Natives are eligible for the federal benefits. The Reindeer Industry Act of 1937, 25 U.S.C. Sec. 500, which provided federal funds and property to the natives of Alaska for subsistence and a self-sustaining economy, defined "Natives of Alaska" as:
 native Indians, Eskimos, and Aleuts of whole or part blood inhabiting Alaska at the time of the Treaty of Cession of Alaska to the United States and their descendants of whole or part blood, together with the Indians and Eskimos who, since the year 1867 and prior to September 1, 1937, have migrated into Alaska from the Dominion of Canada, and their descendants of whole or part blood.
 25 U.S.C. Sec. 500n. ANCSA also utilized a similar criterion:
 "Native" means a citizen of the United States who is a person of one-fourth degree or more Alaska Indian (including Tsimshian Indians not enrolled in the Metlakatla Indian Community), Eskimo, or Aleut blood, or a combination thereof. The term includes any Native as so defined either or both of whose adoptive parents are not Natives. It also includes, in the absence of a minimum of blood quantum, any citizen of the United States who is regarded as an Alaska Native by the Native village or Native group of which he claims to be a member and whose father or mother is (or, if deceased, was) regarded as Native by any village or group.
 43 U.S.C. Sec. 1602(b). These classifications, though they utilize blood quantum criteria, are clearly political classifications based on the unique non-reservation and non-tribal situation of the Alaska Natives.
 
 
 [11]
 AGC concedes that the rational basis test is satisfied in this case
 
 
 [12]
 AGC argues that remand is necessary if the court determines that the HUD regulation is constitutional because genuine issues of fact exist, such as whether requisite findings of past discrimination have been properly and adequately made. These findings would only be necessary if applying strict scrutiny and utilizing Justice Powell's analysis in Fullilove v. Klutznick, 448 U.S. 448, 495-517, 100 S.Ct. 2758, 2783-2794, 65 L.Ed.2d 902 (1980) (Powell, J., concurring). However, because only the rational basis test rather than strict scrutiny applies here, AGC's argument is without merit